UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

RICK EATON,

        Plaintiff,

    v.

MARK J. SIEMENS, an individual
and in his capacity as Chief
of Police, CARLOS A. URRUTIA,
an individual and in his
capacity as City Manager, CITY
OF ROCKLIN, a public
municipality and public
entity,

        Defendants.

NO. 2:07-cv-0315 FCD KJM

MEMORANDUM AND ORDER

----oo0oo----

This matter is before the court on plaintiff Rick Eaton's ("plaintiff") motion to recuse defendants'[1] counsel, Bruce Scheidt ("Scheidt") of Kronick, Moskovitz, Tiedemann & Girard, on the ground Scheidt committed professional misconduct in connection with the arbitration proceedings wherein plaintiff

---

[1]   Defendants are the City of Rocklin (the "City"), Mark J. Siemens ("Siemens"), Chief of Police, and Carlos A. Urrutia ("Urrutia"), City Manager (collectively, "defendants").

1

challenged the City's termination of his employment.[2]
Specifically, plaintiff contends Scheidt (1) "knowingly and
deliberately misled [the arbitrator] by presenting [into
evidence] a backdated and fraudulent version of General Order No.
3 [the disciplinary policy used by defendants as a basis to
terminate plaintiff]" (Pl.'s Mem. of P.& A., filed June 20, 2007
["Pl.'s Mtn."], at 1:28-2:1); and (2) Scheidt did not inform
plaintiff or provide him with an audiotape, prior to the
arbitration proceeding, of an interview Scheidt conducted of
Officer Byron Green ("Green").  Plaintiff maintains that
Scheidt's conduct renders him a material witness in this case,
thereby necessitating his disqualification from service as
defendants' counsel.

   Defendants vigorously oppose plaintiff's allegations of
wrongdoing by Scheidt, asserting that plaintiff's motion is both
"frivolous and reckless," in that it is "devoid of evidentiary
support[3] for its otherwise libelous (if made outside of a court
proceeding) accusations of professional misconduct against a

_____

[2]    Because oral argument will not be of material
assistance, the court orders this matter submitted on the briefs.
E.D. Cal. L.R. 78-230(h).

[3]    In support of their opposition, defendants separately
filed lengthy evidentiary objections to plaintiff's and Green's
declarations filed in support of the motion and plaintiff's
rebuttal declaration filed in support of the reply.  (Docket #s
44, 46, and 50.)  In large part, the objections are sustainable
as the proffered evidence is either inadmissible as hearsay,
lacking in personal knowledge or irrelevant (since, for example,
the evidence fails to prove that Scheidt had any percipient, non-
privileged knowledge, at any time, about the matters Siemens
allegedly testified about at the arbitration).  However, the
court does not rule specifically on any of defendants' objections
herein because even considering plaintiff's evidence in its
entirety, there is no basis for ordering defense counsel's
disqualification.

2

1  member of the California State Bar in good standing." (Opp'n,

2  filed July 10, 2007, at 1:11-13.)

3      To demonstrate a legal basis for disqualification, plaintiff

4  must demonstrate, by admissible evidence, that (1) Scheidt

5  committed professional misconduct which will likely affect the

6  outcome of this litigation; and/or (2) there is a genuine need

7  for Scheidt's testimony, no other means exist to obtain the

8  desired information, the information sought is relevant and non-

9  privileged and the information is crucial to the preparation of

10  the case.  Because plaintiff fails to meet his burden in every

11  respect, the court DENIES plaintiff's motion to recuse

12  defendants' counsel.

13                          **BACKGROUND**

14      Scheidt is an attorney licensed by the State Bar of the

15  State of California to practice before all of the courts of the

16  State of California and the United States District Court, Eastern

17  District of California. (Scheidt Decl., filed July 10, 2007,

18  ¶ 1.)  He is a shareholder in Kronick, Moskovitz, Tiedemann &

19  Girard ("Kronick"), attorney of record in this matter for

20  defendants. (<u>Id.</u> at ¶ 2.)  He is chairman of Kronick's

21  Board of Directors and is chairman of the firm's Labor and

22  Employment Practice Group. (<u>Id.</u>)  He graduated from the

23  University of Pacific's McGeorge School of Law in 1991,

24  with distinction, and has been in private practice continuously

25  since then. (<u>Id.</u>)  Scheidt is the lead trial counsel for

26  defendants in this action. (<u>Id.</u> at ¶ 3.)

27      Scheidt's first contact with Siemens occurred in 2003, in

28  connection with plaintiff's filing a Petition of Writ of

                                3

Administrative Mandamus challenging the City's 40-hour
suspension of him for violation of the City of Rocklin Police
Department's ("Department") sexual harassment policy.  Plaintiff
filed a Petition for Writ of Administrative Mandamus to reverse
his suspension on an alleged statute of limitations defense under
the Public Safety Officers Procedural Bill of Rights Act
("POPBRA").  Scheidt represented the City in opposing plaintiff's
petition.[4]  The Superior Court of the County of Placer, State of
California, denied plaintiff's writ.  (<u>Id.</u> at ¶ 6.)

Scheidt then served as lead counsel for the City in 2005 in
the arbitration, conducted in accordance with the American
Arbitration Association's Voluntary Arbitration Rules, of
plaintiff's grievance of his employment termination. (<u>Id.</u> at ¶
4.)  The administrative record of the arbitration hearing
consists of seven days of hearings before Arbitrator William
Riker (the "arbitrator"), totaling more than 1300 pages of
transcripts of witness testimony, including more than 100
exhibits submitted and moved into evidence.  (<u>Id.</u>)  The
arbitrator ultimately recommended to defendant Urrutia that the
City's termination of plaintiff "for cause" be sustained and his
grievance/appeal be denied. (<u>See</u> Mem. & Order, filed May 23,
2007.)

_____

[4]    In his reply, plaintiff alleges Scheidt committed
professional misconduct in connection with this early proceeding
as well; specifically, plaintiff contends Scheidt withheld from
plaintiff "critical police log documents" in his 2003 arbitration
proceeding.  (Reply, filed July 20, 2007, at 11-12.)  The court
does not consider these allegations herein as they were raised by
plaintiff, for the first time, in his reply, and more
importantly, the 2003 disciplinary proceedings are not at issue
in this action.

4

1   Plaintiff filed the instant action on February 16, 2007.

2   Scheidt is not a named defendant, and there are no allegations

3   against Scheidt personally in the complaint.  (Compl., filed Feb.

4   16, 2007.)  The gravamen of plaintiff's complaint concerns his

5   termination by the City in September 2004.

6   Plaintiff was served with the Notice of Intent to Terminate

7   along with the accompanying written materials on September 30,

8   2004.  (Siemens Decl., filed July 10, 2007, ¶ 8, Ex. E.)  He was

9   later served with a Notice of Termination dated November 1, 2004,

10  on or about November 2, 2004.  (Eaton Decl., June 20, 2007, ¶ 18;

11  Siemens Decl., Ex. F.)  Provisions of the revised 2001 version of

12  "General Order 3," the Department's disciplinary policy, were

13  cited in the Notice of Termination.  (Siemens Decl., ¶ 11

14  [*compare* Ex. F (Notice of Termination) and Ex. B (2001 revised

15  General Order 3)].)  The Notice also cited a January 16, 2003,

16  Departmental Directive and Admonition (the "Departmental

17  Directive") as an additional policy basis for the discipline.

18  (Id. at Ex. G.)

19  The Notice of Termination identified six factual bases for

20  plaintiff's termination, along with citations to specific policy

21  provisions in the 2001 revised version of General Order 3.  (Id.

22  at ¶ 10, Ex. F.)  Specifically, the six factual grounds

23  constituted: (1) disobedience or insubordination; (2) wrongful,

24  unlawful exercise of authority; (3) disparaging remarks or

25  conduct; (4) knowingly making false, misleading, or malicious

26  statements; (5) knowing or negligent violation of the Department

27  Manual; and (6) failure to support the mission of the agency, its

28  policies, procedures, orders, and directions of the Chief of

5

Police and his immediate commanding officer. (<u>Id.</u> at ¶ 13, Ex. F.) The 2001 version of General Order 3, quoted in the Notice, was used to support four of the six charges. (<u>Id.</u> at ¶s 10, 14.) The Departmental Directive independently supported all six grounds for plaintiff's termination. (<u>Id.</u> at ¶s 10, 13-18.)

While the Notice of Termination, itself, cited provisions of the 2001 revised version of General Order 3, provided to plaintiff with the notice was a copy of an earlier *1997* version of General Order 3. At the time of plaintiff's termination, Siemens was not aware that the 1997 version of General Order 3 rather than the 2001 version, cited in the Notice, was provided to plaintiff.[5] (Siemens Decl., ¶ 9.) Plaintiff's employment termination took effect on or about November 2, 2004. (Eaton Decl., ¶ 1.)

---

[5] In support of defendants' opposition, Siemens compared the relevant provisions from the 1997 version of General Order 3 with the citations from the 2001 version of General Order 3 that are quoted verbatim in the Notice of Termination. (Siemens Decl., ¶ 11.) Both versions of General Order 3 expressly state that "insubordination" is cause for discipline, up to and including termination. (<u>Id.</u> at ¶ 11 and Ex. A [General Order 3, rev. 10-15-97, § I.A.4]; Ex. B [General Order 3, rev. 12-05-01, § III.A.5.e.].) In addition to stating that "insubordination" is cause for termination, the 1997 version of General Order 3 states: "No employee shall, when acting within the scope of employment, openly or publicly criticize the Department or any member of the Department. Constructive criticism through appropriate channels is always welcome." (<u>Id.</u> at ¶ 12 and Ex. A thereto [General Order 3, rev. 10-15-97, § VIII.E.1, p. 4 of 7].) Siemens declares that is materially the same as a cause for discipline under the 2001 version of General Order 3, which states in relevant part: "Disparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of the Department or subverts the good order, efficiency and discipline of the Department or that would tend to discredit any member thereof." (<u>Id.</u> at ¶ 12 and Ex. B [General Order 3, rev. 12-05-01, § III.A.5.g].)

1   Over the years, the Department's disciplinary policy has

2   been periodically revised.  When Siemens arrived in his current

3   position as Chief of Police, the Department had a disciplinary

4   policy called "General Order 3." (Siemens Decl., ¶ 3 and Ex. A.)

5   At the time of Siemens hiring by the City in July 2001, General

6   Order 3 had been last revised in October 1997.  (Id.)  Siemens

7   brought with him from the City of Marysville a compact disk

8   containing a copy of a disciplinary policy that had been adopted

9   by the City of Marysville Police Department and originally

10  developed for police departments throughout the State by the

11  attorney firm of Ferguson, Praet and Sherman and its

12  policy-manual branch now known as "Lexipol."  (Id. at ¶ 4.)

13  Siemens inserted language from the City of Marysville Police

14  Department's disciplinary policy into a Microsoft Word file on

15  his computer in his office at the Department on or about December

16  2001.  (Id. at ¶ 5.)  On or shortly after that date, he asked his

17  secretary, Debbie Miller ("Miller"), to reformat the Lexipol

18  draft disciplinary policy into a revised version of "General

19  Order 3," to replace the 1997 version.  (Id.)  He also asked

20  Miller to distribute the revised version of "General Order 3" to

21  officers in the Department after she completed her reformatting

22  work.  (Id. at Ex. B.)[6]

23  _____

24      [6]    Miller, who first began working with Siemens on
    November 13, 2001, recalls that as one of her earliest

25  assignments, Siemens asked her to reformat a revised General
    Order 3.  (Miller Decl., filed July 10, 2007, ¶ 3.)   She

26  performed that task.  (Id.)  Miller specifically recalls that
    Siemens asked her to disseminate the 2001 revised version of

27  General Order 3.  (Id. at ¶ 4.)  To comply with that instruction,
    she made a copy of it and placed that copy on a clipboard in the

28  roll call room in the old Police Department (which is now
    the City Fire Department).  (Id. at Ex. A thereto [2001 revised

1   Siemens did not modify or cause anyone else to modify the
2   2001 revised version of the Department's General Order 3 at any
3   time after December 2001. (Id. at ¶ 6.)  However, in 2004, he
4   used a 2004 draft disciplinary policy from Lexipol to replace the
5   2001 revised General Order 3 with "Section 340" (dated February
6   2004) of the Rocklin Police Department's Manual as the operative
7   disciplinary policy for the Department.  (Id. at Ex. C.)[7]

8   To corroborate Siemens' testimony, defendants offer the
9   declaration of forensic computer expert, Mark J. Menz ("Menz"),
10  who analyzed two CD-ROMs that contained computer files prepared
11  by Siemens and Miller at their computers.  (Menz Decl., filed
12  July 10, 2007, ¶ 2.)  Each CD contained a single Microsoft Word
13  document file.  (Id.)  Menz examined the two documents to
14  determine the creation date and last access date of the
15  documents.  (Id. at ¶ 3.)  He concluded:

> The document with the filename "Disciplinary Policy.doc"
> was created on 12/03/2001 at 11:03:00AM.  The last time it
> was revised was on 12/03/2001 at 5:02:00PM by the user
> profile "Siemens."  The document with the filename "3 –
> Revision #2 – RULES AND REGULATIONS.doc" was created on
> 12/06/2001 at 8:43:00 AM.  The last time the document was
> revised was on 12/11/2001 at 1:42:00PM by the user profile
> "MillerD."

(Id. at ¶ 9, Ex. C.)

Also relating to Siemens' testimony, defendants offer the
declaration of Rocklin Police Captain Dan Ruden ("Ruden"), who

─────────────

version of General Order 3].)

    [7]   Minutes of Siemens' staff meetings show he informed
plaintiff and other police supervisors on at least five
occasions, starting January 3, 2002, that a Lexipol draft policy
manual ultimately would replace all general orders.  Siemens
informed plaintiff and other police supervisors that the Lexipol
draft policy manual would be accessible on supervisors' patrol
car computers. (Id. at ¶ 7.)

examined the Department's internal affairs records regarding
employee discipline of sworn peace officers relating to actions
or omissions that allegedly occurred during the time period from
December 1, 2001 (the date stated on the 2001 revised General
Order 3), and 2004 when "Section 304" of the Rocklin Police
Department's Manual went into effect. (Ruden Decl., filed July
10, 2007, ¶ 6.) Ruden performed this review to ascertain whether
the 1997 or 2001 version of General Order 3 was used as the basis
for the disciplinary action. He found one action involving a
community service employee wherein the 1997 version of General
Order 3 was used, despite the conduct occurring after December 1,
2001, and another action against a peace officer for conduct
during this same time wherein the 2001 version of General Order 3
was used. (Id. at ¶s 7-8.) In Ruden's opinion, this overlapping
use of the 1997 and 2001 versions of General Order 3, during the
time period of December 2001 through 2004 (when disciplinary
policy "Section 340" went into effect) was "inadvertent." (Id.
at ¶ 9.) At the time of the disciplinary actions against these
employees, Siemens was not aware of the overlapping use of these
versions of the disciplinary policy. (Siemens Decl., ¶ 12.)

Scheidt attests that he does not have any percipient
knowledge about the Department's preparation of, or revisions to,
General Order 3, upon which plaintiff's termination was based.
(Scheidt Decl., ¶ 5.) The sole source of all information that he
has been told about General Order 3's preparation and/or
revisions is attorney-client privileged communications with his
clients, the City and Siemens. (Id.) Scheidt was also not
involved in serving plaintiff with the Notice of Intent to

9

Terminate and accompanying materials on September 30, 2004. (<u>Id.</u> at ¶s 17, 19.)  Siemens personally served the Notice on plaintiff along with copies of the written materials on which the City relied in making the decision to terminate his employment. (Siemens Decl., ¶ 8, Ex. E [without attachments or exhibits].) Miller and Ruden assisted Siemens in organizing the documents attached to the Notice of Termination. (<u>Id.</u> at ¶ 9.)

At the subject arbitration hearing in 2005, Siemens authenticated General Order 3 as revised in December 2001 and explained why the Order had been revised. (Scheidt Decl., ¶ 23, Ex. A at 377:18-380:7.)  Plaintiff's counsel objected to the admissibility of the 2001 version of General Order 3, claiming said order had not been provided to plaintiff previously.  The arbitrator permitted plaintiff's counsel to question Siemens on the admissibility of "Exhibit M," which the City offered as General Order 3 as revised in December 2001.  Plaintiff's lawyer also cross-examined Siemens regarding the posting and distribution of General Order 3 as revised. (<u>Id.</u> at Ex. A at 380:8-386:25.)  At the conclusion of plaintiff's counsel's questioning of Siemens, the arbitrator overruled plaintiff's objection, received General Order 3 as revised December 2001 into evidence and invited the parties to brief the "difference in wording" of the 1997 and 2001 versions of the Order. (<u>Id.</u> at ¶ 24, Ex. A at 387:1-11.)

Prior to the arbitration, the Department was served with subpoenas issued by plaintiff's counsel commanding many of the Department's police officers to appear and testify at the arbitration. (Siemens Decl., ¶ 24.)  Green was one of those

officers subpoenaed. (_Id._ at Ex. K.)  In preparation for the

hearing, Scheidt interviewed Green and the other employees to

discuss their potential testimony. (Scheidt Decl., ¶ 7.)

Contrary to Green's assertions in his declaration filed in

support of plaintiff's motion, Scheidt maintains that he did not

tell Green during the interview that Scheidt was asking him

questions which would tend to bolster the claims against

plaintiff. (_Id._ at ¶ 8.)  The purpose of Green's interview,

Scheidt asserts, was to learn any and all harmful and helpful

information about which Green might testify. (_Id._)  Again

contrary to Green's claims, Scheidt attests he did not instruct

Green that he could not testify or not talk to plaintiff and/or

plaintiff's lawyer. (_Id._ at ¶ 9.)  Scheidt also disputes Green's

contention that Scheidt audio-taped his interview with Green or

any of the other police department employees who were subpoenaed

by plaintiff's counsel. (_Id._ at ¶ 10.)  Ruden also declares,

contrary to Green's testimony (but consistent with Scheidt's

testimony), that he does not recall being in attendance at

Green's interview conducted by Scheidt.  Ruden does, however,

recall conducting a tape-recorded interview of Green in December

2005, which interview was unrelated to plaintiff. (Ruden Decl.,

¶ 5.)

Plaintiff's counsel did not call Green to testify at the

arbitration.  However, plaintiff testified on direction

examination by his counsel as to what Green told him concerning

Siemens' alleged personal use of a City vehicle. (Scheidt Decl.,

¶ 11, Ex. A at 776:19-777:11.)

**STANDARD**

This district has adopted the Rules of Professional Conduct of the State Bar of California and decisions of any court applicable thereto as standards of professional conduct in this court.  E.D. Cal. L.R. 183-180(e); <u>see also</u> <u>In re County of Los Angeles</u>, 223 F.3d 990, 995 (9th Cir. 2000) (federal courts apply state law in determining matters of disqualification).  Ultimately, the court has discretionary authority under its inherent powers to disqualify counsel because of a violation of professional ethics.  <u>Crenshaw v. MONY Life Ins. Co.</u>, 318 F. Supp. 2d 1015, 1020 (S.D. Cal. 2004).  Nevertheless, disqualification is "a drastic measure that is disfavored."  <u>Id.</u>  Indeed, "[e]ven a violation of the California Rules of Professional Conduct does not automatically compel disqualification."  <u>Id.</u>  Courts routinely recognize the highly limited scope of disqualification:

> Since the purpose of a disqualification order must be prophylactic, not punitive, the significant question is whether there exists a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court.

<u>Hetos Investments, LTD v. Kurtin</u>, 110 Cal. App. 4th 36, 48 (2003).

Here, in addition to alleging Scheidt committed professional misconduct, plaintiff also moves for disqualification specifically on the ground that Scheidt is a material witness to this action.  In such cases, plaintiff bears the burden of proof to demonstrate the basis for disqualification.  <u>See</u> <u>Colyer v. Smith</u>, 50 F. Supp. 2d 966, 967 (C.D. Cal. 1999) (the moving party

12

failed to demonstrate his need for the testimony of opposing

counsel).  "A motion to disqualify should be accompanied by

declarations and admissible evidence sufficient to establish the

factual predicate upon which the motion depends." Id.; Smith,

Smith & Kring. v. Sup. Ct., 60 Cal. App. 4th 573, 577-78 (1997)

(evidence for recusal of an attorney witness must be more than

conclusory allegations; absent evidentiary support, court on

motion to disqualify should disregard factual contentions made in

moving papers).

"[W]henever an adversary declares his intent to call

opposing counsel as a witness, prior to ordering disqualification

of counsel, the court should determine whether counsel's

testimony is, in fact, genuinely needed.'" Id. at 581 (citations

omitted).  The standard to depose opposing counsel sets an

equally high bar.  A party seeking to take the deposition of

opposing counsel must show that (1) no other means exist to

obtain the information than to depose opposing counsel, (2) the

information sought is relevant and nonprivileged; and (3) the

information is crucial to the preparation of the case. Doubleday

v. Ruh, 149 F.R.D. 601, 613-14 (E.D. Cal. 1993).

**ANALYSIS**

**A.    Scheidt Did Not Commit Professional Misconduct
       Warranting Disqualification**

**1.    General Order 3**

As the primary basis for this motion, plaintiff alleges that

Scheidt committed professional misconduct, justifying his

recusal, by "knowingly and deliberately misled[ing] [the

arbitrator] by presenting a backdated and fraudulent version of

General Order 3 . . . as a true and correct copy of [the Order]."
(Pl.'s Mot. at 1:7-2:1.)   Yet, plaintiff offers *no* evidence in
support of this serious allegation.   Neither plaintiff's
declaration nor Green's declaration (the sole "evidence"
submitted in support of the motion) contain *any allegations*, let
alone facts, that Scheidt had responsibility, was involved in, or
has personal knowledge as to the preparation and revisions to
General Order 3.   Instead of evidence, plaintiff relies on pure
speculation.   (See e.g., Pl.'s Mot. at 3:19-22 [concluding that
"Siemens was not alone in perpetrating [the alleged] fraud,"
implying that Scheidt assisted Siemens but failing to cite any
evidence or even a description of how Scheidt purportedly did
so].)

In stark contrast, defendants present admissible evidence
establishing the falsity of plaintiff's allegations.   Scheidt
states in his declaration under penalty of perjury that he does
not have any percipient knowledge about the Department's
preparation of, or revisions to General Order 3, and that the
sole source of all information that he has been told about
General Order 3's preparation and/or revisions are
attorney-client privileged communications with his clients.
(Scheidt Decl., ¶ 5.)   Similarly, Siemens also declares that
Scheidt "is not a percipient witness to plaintiff's misconduct
nor the preparation of the Police Department's disciplinary rules
and general orders."   (Siemens Decl., ¶ 27.)[8]

---

[8]      In his reply, plaintiff emphasizes that Scheidt was
involved in another officer's disciplinary proceedings, during
the same time frame, wherein the officer was disciplined under
the 1997 version of General Order 3.   Plaintiff asserts this fact

Indeed, it was Siemens, not Scheidt, who authenticated General Order 3 as revised in December 2001 (identified as Exhibit M in the arbitration) and testified about its contents.[9] (Scheidt Decl., ¶ 23, Ex. A at 377:18-380:7.)  As described above, Siemens and his secretary Miller attest that the 2001 version of the Order was created in 2001 and steps were taken to disseminate the revised policy. (Siemens Decl., ¶s 4-7; Miller Decl., ¶ 3-5.)  To corroborate their testimony herein, defendants proffer the testimony of forensic computer expert Menz who attests that the version of General Order 3, introduced at the arbitration, which is facially dated 2001 was *not* fraudulently backdated; instead, it was created in 2001 by Siemens and Miller and has not been revised since then.  (Menz Decl., ¶ 9.)

This court properly assumes that lawyers behave ethically. DCH Health Servs. Corp. v. Waite, 95 Cal. App. 4th 829, 834 (2002) ("[T]he court should start with the presumption that, unless proven otherwise, lawyers will behave in an ethical manner.")  Here, plaintiff has wholly failed to rebut this

---

demonstrates Schedit *knew* that the 1997 Order was the operable order at the time, not the 2001 version.  Plaintiff's assertion is baseless.  As set forth above, Ruden explains that inadvertently during the applicable time frame, the City used, on two occasions, the 1997 and 2001 versions of General Order 3 interchangeably.  However, as to this use, again, plaintiff has not produced any evidence that Scheidt had percipient knowledge of this fact, and Scheidt declares that he did not.

[9]    Moreover, contrary to plaintiff's suggestions in his declaration, Scheidt did not admit any wrongdoing at the arbitration.  While Scheidt did remark, at one point, with respect to General Order 3, that a "miscopy job" had occurred, he was referencing the fact that "even numbered pages [of the Order] were missing" from the copy he was using during Siemens' direct examination.  A lunch break was thereafter taken to permit time to gather a complete copy for use during the proceedings. (Scheidt Decl., ¶ 25, Ex. A at 296:15-297:16.)

presumption with respect to the introduction at the arbitration of the 2001 revised version of General Order 3.

Moreover, the court also notes that plaintiff has not shown that he was harmed by the introduction of the General Order or that its introduction injured the integrity of the arbitration proceeding.  <u>Smith, Smith & Kring</u>, 60 Cal. App. 4th at 579 (the moving party must convincingly demonstrate detriment to the party requesting recusal or injury to the integrity of the judicial process to warrant disqualification of counsel).  Plaintiff's assertion that the arbitrator was misled by counsel is specious. Plaintiff has made no showing that Scheidt, or any of the defendants for that matter, misled the arbitrator concerning General Order 3 and its various revisions.  This issue was expressly addressed by the parties at the arbitration; Siemens was cross-examined by plaintiff's counsel on the issue, and the arbitrator invited the parties to brief the "difference in wording" of the 1997 and 2001 versions of General Order 3.

On that latter issue, as set forth above, defendants proffer evidence in support of their position that the two disciplinary policies (1997 and 2001) made no material difference in plaintiff's termination. (Siemens Decl. ¶s 10-19.)  Siemens attests that plaintiff would have been terminated under either version of General Order 3.  More importantly, plaintiff's arguments in support of disqualification ignore the fact that plaintiff was *independently* terminated pursuant to the *separate* Departmental Directive, which was also expressly quoted in the Notice of Termination as the basis for all six charges, and plaintiff admits he received that Directive.  (<u>Id.</u>)  Thus,

16

plaintiff's claim of fraudulent backdating of the policy dated
2001 is alternatively unavailing because plaintiff submits no
evidence that the variation in policy wording between the 1997
and 2001 policies (to the small extent there are such
differences) had any fundamental effect on the charges asserted
against him as the bases for his termination.[10]

### 2. Green Interview

Plaintiff asserts that Scheidt's failure to inform him of
Scheidt's interview of Green and failure to produce an alleged[11]
audiotape of the interview prior to the arbitration violated
POPBRA, Cal. Gov't Code § 3303.  Said statute provides certain
procedural guarantees to:  "any public safety officer [that] is
under investigation and subject to interrogation . . . ."  Thus,
the statute simply does not apply to Scheidt's interview of Green
as neither Green nor plaintiff were "under investigation" at the
time.

---

[10]   In his reply, seemingly realizing that he cannot refute
defendants' evidence that Siemens did not create a backdated and
fraudulent General Order 3 (indeed, plaintiff offers no response
whatsoever to Menz' declaration), plaintiff instead argues at
length about whether the 2001 General Order 3 was properly
implemented by defendants so as to serve as a valid basis for
plaintiff's termination.  However, that issue is not before the
court on this motion to recuse, and nothing stated herein is
meant to reflect this court's decision on the substantive merits
of the issues presented in this case.  Rather, the focus of this
motion is limited--whether plaintiff has demonstrated that
Scheidt committed professional misconduct warranting
disqualification and/or whether Scheidt is a necessary witness to
this action.

[11]   As set forth above, Scheidt disputes, among other facts
alleged in Green's declaration, that he tape recorded Green's
interview.  The court need not resolve these factual disputes
because even assuming as true the facts as described by Green,
Scheidt did not commit any misconduct.

As to Green, Scheidt did not interview him in connection with any investigation of which Green was the subject.  (Scheidt Decl., ¶ 12.)  Green does not allege otherwise in his declaration.  (Green Decl., filed June 20, 2007.)  Rather, Green was interviewed because he had been subpoenaed by plaintiff to testify on plaintiff's behalf at the arbitration.  (Scheidt Decl., ¶ 7.)  Therefore, because Green was not under investigation, he was not entitled to any procedures under Section 3303 with regard to his interview with Scheidt.

Furthermore, there was no pending, punitive action against plaintiff at the time of Green's interview in mid-2005 since plaintiff had already been terminated as of November 2, 2004.  (Pl.'s Decl, ¶ 18.)  Thus, while, in one sense, plaintiff was the "subject" of the arbitration, in that it considered the propriety of his termination, plaintiff was not "*under investigation*" at the time of the arbitration since his employment had been terminated long before.  Accordingly, plaintiff was not entitled to any procedures pursuant to Section 3303 in connection with Scheidt's interview of Green.[12]

---

[12]    Plaintiff's citation in his reply to <u>Wellpoint Health Networks, Inc. v. Sup. Ct.</u>, 59 Cal. App. 4th 110 (1997) to argue that Scheidt's communications with Green are not protected by the attorney-client and/or work product privileges, is not persuasive.  <u>Wellpoint</u> considered whether an attorney's communications with an *employee* while *investigating* the employee's Title VII complaints are privileged; the court found that when the attorney acts as a factual investigator, as opposed to a legal advisor, his communications are not privileged.  <u>Id.</u> at 127.  Thus, <u>Wellpoint</u> is inapposite here; Scheidt's interview of Green was not part of an investigation into any employee's allegations (including plaintiff's), Title VII or otherwise.  Rather, Scheidt conducted Green's interview as part of his duties as attorney for defendants, to prepare for the arbitration proceeding in which plaintiff indicated his intent to call Green as a witness.

Moreover, like plaintiff's argument with respect to General Order 3, plaintiff's argument regarding the Green interview is alternatively unavailing because plaintiff has not shown that he was harmed by Scheidt's failure to disclose his interview of Green.  Plaintiff's counsel did not call Green to testify at the arbitration.  (Scheidt Decl., ¶ 11.)  However, plaintiff testified on direct examination as to what Green told him regarding Siemens' alleged personal use of a City vehicle.  Thus, plaintiff was permitted to offer Green's allegedly favorable testimony and cannot now assert an injury to his interests.[13]

**B.   Scheidt Is Not a Necessary Witness to this Case**

For similar reasons to those stated above demonstrating that Scheidt did not commit professional misconduct, plaintiff has also not demonstrated that Scheidt is a necessary witness to this action.  Smith, Smith & Kring, 60 Cal. App. 4th at 581.  Scheidt is not a percipient witness to the creation, dating or contents of the successive versions of the Department's disciplinary policies.  Any information he has concerning these facts are protected by the attorney-client privilege.  Similarly, any information he derived from Green is protected by the work product privilege.  As demonstrated by the various declarations submitted on the motion, the relevant percipient witnesses to these matters are Siemens, Miller, Ruden and Green.  Nothing

---

[13]   In fact, Siemens' personal use of a City vehicle was not in dispute. Siemens did not deny the use as his Employment Agreement with the City expressly allowed it. (Siemens Decl., ¶ 25, Ex. L at 2, para. 3B(3) [permitting use of a City vehicle up to 120 miles outside the City of Rocklin's city limits].) Moreover, the issue was inconsequential to the arbitration as *Siemens'* conduct had nothing to do with the charges against plaintiff.

prevents plaintiff from seeking discovery from these persons. Plaintiff may not, however, seek such discovery from Scheidt, as any information he possesses is privileged and other means exist to obtain the desired information.  <u>Doubleday</u>, 149 F.R.D. at 613-14.[14]

**C.   <u>Scheidt's Clients' Consent to His Continued Representation is an Alternative Reason to Deny the Motion</u>**

Plaintiff ignores in his reply the fact that defendants consent to Scheidt's continued representation regardless of his alleged status as a witness in this case.  Thus, even were this court to have found Scheidt a necessary witness to this action, defendants agree to his continued representation and request the court not order his disqualification, arguing any such disqualification would impose an undue burden on them in light of Scheidt's extensive work on the case and history representing defendants.  (Siemens Decl., ¶ 26.)  Plaintiff's reliance on <u>Comden v. Sup. Ct.</u>, 20 Cal. 3d 906, 915-16 (1978) (disqualifying an attorney solely on the basis that the attorney was a potential witness at trial) is inapposite as at that time (1978), the California Rules of Professional Conduct did not contain a client consent provision.  Now, pursuant to Rule 5-210(C),[15] a client can consent to his counsel serving as both witness and advocate. Defendants have provided such consent in this case, and thus, the

---

[14]   Thus, plaintiff's alternative request for an order permitting Scheidt's deposition, regardless of the outcome on the motion to recuse, is DENIED.

[15]   Said Rule provides: "A member shall not act as an advocate before a jury which will hear testimony from the member unless: . . . or (C) The member has the informed, written consent of the client."

court could alternatively deny the instant motion *even if* plaintiff could prove it is necessary for Scheidt to testify (although, for the reasons set forth above, plaintiff cannot do so).

**CONCLUSION**

For the foregoing reasons, plaintiff's motion to recuse defendants' counsel is DENIED.

IT IS SO ORDERED.

DATED: August 10, 2007

FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE