UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

RICK EATON,

        Plaintiff,

   v.

MARK J. SIEMENS, an individual
and in his capacity as Chief
of Police, CARLOS A. URRUTIA,
an individual and in his
capacity as City Manager, CITY
OF ROCKLIN, a public
municipality and public
entity,

        Defendants.

NO. CIV. S-07-315 FCD KJM

MEMORANDUM AND ORDER

----oo0oo----

    This matter is before the court on a motion for summary
judgment, or alternatively, partial summary judgment brought by
defendants City of Rocklin (the "City"), Mark J. Siemens, Chief
of Police for the City ("Siemens") and Carlos A. Urrutia, City
Manager ("Urrutia") (collectively, "defendants"). By the motion,
defendants seek adjudication in their favor on plaintiff's first
amended complaint, alleging claims for (1) violation of

plaintiff's Fourteenth Amendment equal protection rights, pursuant to 42 U.S.C. § 1983 ("Section 1983"), based on defendants' alleged class-based discriminatory treatment of a distinct group of employees, of which plaintiff was a member; (2) violation of plaintiff's Fourteenth Amendment substantive due process rights, pursuant to Section 1983, based on defendants' alleged deprivation of plaintiff's right to pursue his chosen profession; (3) violation of plaintiff's First Amendment free speech rights, pursuant to Section 1983, based on defendants' alleged retaliation against plaintiff for reporting wrongdoing by defendants; (4) violation of California Government Code §§ 1102.5 *et seq.* (California's so-called "Whistle-blowers" statute) based on the City's alleged retaliation against plaintiff for reporting wrongdoing by the City; and (5) violation of California's Public Safety Officers' Procedural Bill of Rights Act ("POPBR"), Cal. Gov.'t Code §§ 3303 *et seq.*, based on alleged procedural irregularities by the City in terminating plaintiff.  Plaintiff alleges his Section 1983 claims against the City, Siemens and Urrutia;[1] his state law claims are alleged against the City only.

With respect to these claims, defendants contend they are entitled to judgment as a matter of law because (1) as to plaintiff's equal protection claim, plaintiff cannot demonstrate that he and/or a similarly situated class of persons was arbitrarily disciplined or terminated for reporting defendants'

---

[1]     Plaintiff's Section 1983 claims are pressed against the City pursuant to Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 691 (1978) which permits a plaintiff, under certain circumstances, to assert a damages claim against a municipality for civil rights violations.

1  illegal activities or refusing to participate in illegal

2  activities; (2) as to plaintiff's free speech claim, plaintiff

3  cannot demonstrate he was terminated based upon speech protected

4  by the First Amendment; (3) as to plaintiff's substantive due

5  process claim, plaintiff cannot show defendants' actions deprived

6  him of pursuing a career in law enforcement; (4) as to all of

7  plaintiff's claims against the City, pursuant to <u>Monell</u>,

8  plaintiff has no evidence of a formal policy or long-standing

9  practice or custom of the City to discriminate against employees

10 for reporting violations of law or encouraging illegal activity

11 or evidence that a final-policy maker for the City ratified any

12 such conduct; (5) as to plaintiff's "whistle-blower" claim under

13 California law, his claim is barred for a failure to exhaust

14 judicial remedies, or alternatively, plaintiff cannot show he was

15 terminated for speech protected by the statute; and finally,

16 (6) as to plaintiff's POPBR claim, his claim is barred for a

17 failure to exhaust judicial remedies, or alternatively,

18 plaintiff's claims of procedural irregularities are time-barred,

19 and/or it is undisputed that plaintiff was informed of the nature

20 of the City's investigation prior to his internal affairs

21 interrogation.

22      Plaintiff opposes the motion, arguing that triable issues of

23 fact remain as to each of his claims for relief.[2]  For the

24 reasons set forth below, the court GRANTS in part and DENIES in

25 part defendants' motion.

26

27      [2]   Because oral argument will not be of material
   assistance, the court orders this matter submitted on the briefs.
28 E.D. Cal. L.R. 78-230(h).

3

**BACKGROUND**[3]

Plaintiff joined the City of Rocklin Police Department ("RPD") in 1984 as a Reserve Police Officer and was hired full time in 1986. He was promoted to Sergeant in 1989. (First Am. Compl. ["FAC"], filed Oct. 11, 2008, ¶ 13.)[4] In 2000, plaintiff and other members of the RPD testified before the Placer County Grand Jury about numerous, alleged violations of law occurring within the RPD. (RDF ¶s 6, 9.) As a result of the grand jury investigation, RPD Police Chief Prince resigned; defendant Urrutia hired defendant Siemens as Prince's replacement. (FAC ¶ 19.)

In November 2002, plaintiff received a 40-hour unpaid suspension for "verbal harassment in the form of unwanted and inappropriate sexually oriented comments." (RUF ¶ 87.) Plaintiff was charged with requesting to see a female subordinate

---

[3]   Unless otherwise noted, the court finds the following facts undisputed. (Defs.' Reply to Pl.'s Resp. to Defs.' Stmt. of Undisputed Facts ["RUF"] [Docket #s 190-194], filed Sept. 15, 2009.) In some critical respects, plaintiff attempts to dispute defendants' undisputed facts but he has not submitted material and admissible evidence to do so. As such, the court finds those facts undisputed. Where plaintiff has submitted material and admissible evidence to dispute relevant facts, the court recounts plaintiff's version of the facts. (Defs.' Reply to Pl.'s Sep. Stmt. of Disputed Facts in Opp'n to Defs.' MSJ ["RDF"] [Docket #186], filed Sept. 15, 2009.)
    Both plaintiff and defendants have filed objections to evidence. The court has reviewed the objections and the disputed evidence and relies only on admissible evidence herein. <u>See Orr v. Bank of Am., NT & SA</u>, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").

[4]   The court cites to the FAC at times in the factual background since the parties, despite proffering in total some 473 factual statements, did not include certain, basic facts in the statements of undisputed and disputed facts. However, the parties do not appear to dispute these background facts, and thus, the court cites to the FAC as support.

officer's surgically enhanced breasts while he was supervising
her alone in a patrol vehicle. (RUF ¶s 58, 87.) In March 2003,
plaintiff filed a state lawsuit challenging the disciplinary
action on procedural grounds; his writ of mandamus was ultimately
denied by the Placer County Superior Court. (RUF ¶ 87.)

Also in March 2003, while plaintiff was challenging his 40-
hour suspension for verbal harassment in state court, Siemens
promoted then Sergeant Steve Newman ("Newman") to Acting
Lieutenant. (RUF ¶ 86.) In that position, Newman became
plaintiff's immediate supervisor. (RUF ¶ 163.)

Previously, in 1998, plaintiff discovered from two newspaper
articles that Newman pled no contest to a misdemeanor count of
petty theft while employed as a police sergeant for the City of
Santa Clara. (RUF ¶s 143-153, 156.)[5] Notwithstanding this
knowledge of Newman's criminal history, plaintiff did not object
when Newman was originally hired by the City and prior to
Newman's promotion, plaintiff supervised Newman and gave him two
positive performance evaluations in 1998 and 1999. (RUF ¶s 90,
143, 151, 158, 168.) However, once Newman was promoted to be
plaintiff's supervisor in March 2003, plaintiff went to Siemens
and showed him the newspaper articles regarding Newman's
misdemeanor conviction. (RUF ¶ 156.) Siemens told plaintiff
that because he was not the police chief when Newman was hired,

---

[5]     In December 1996, Newman pled no contest to petty theft
for taking photographs of professional models, both dressed and
undressed, off a desk. He resigned from the Santa Clara Police
Department. At his sentencing, the judge accepted Newman's no
contest plea and agreed to purge Newman's criminal record.
Newman has no criminal record from the incident. (RUF ¶s 141-
142.)

he would review Newman's employment file.  That same day, Siemens informed plaintiff that a full background investigation of Newman had been done when Newman was hired, and the information regarding Newman's conviction had been fully disclosed to the department.  (RUF ¶s 141-142, 162.)

Plaintiff told Siemens about Newman's history out of "loyalty" to the department and because he did not want Siemens to be "blind-sided" by the information if he was unaware of it. (RUF ¶ 158.)  Siemens told plaintiff not to discuss the information within the department as it was "old news" and there was no benefit to disclosing the information.  (RUF ¶ 163.)

However, plaintiff believed Newman's misdemeanor conviction for theft, of what plaintiff asserted was pornographic materials, was significant because on any case in which Newman was the arresting officer, such information would have to be disclosed to the District Attorneys' Office and any criminal defense attorneys pursuant to "Brady v. Maryland."[6]  Plaintiff believed Newman's credibility could be attacked if he was a witness testifying in court, and that his criminal history would jeopardize the department's cases.  (Pl.'s Decl., filed Aug. 24, 2009 [Docket #179], ¶s 37, 47, 51.)[7]

---

[6]    Pursuant to Brady v. Maryland, 373 U.S. 83, 87 (1963), criminal prosecutors have a duty to disclose evidence to criminal defendants when the evidence is material and favorable to the defendant.  If there is a failure to do so, a criminal defendant may assert a due process violation under the Fifth and Fourteenth Amendments.  Id.

[7]    At times herein, the court cites to the underlying evidence, as the parties' statements of undisputed and disputed facts do not clearly set forth the relevant facts.

1   Despite Siemens' warning to not discuss the matter,
2   plaintiff discussed Newman's employment history at the Santa
3   Clara police department in briefings and conversations with
4   subordinate officers between October and December 2003.  (RUF
5   ¶s 212-225.)  More specifically, plaintiff questioned Newman's
6   credibility and fitness as a police officer in front of his
7   subordinate officers, and he questioned why the City hired and
8   promoted Newman to lieutenant in briefings to subordinate
9   officers.  (RUF ¶s 212, 213, 225.)

10  Also during this time, in October 2003, plaintiff had a
11  confrontation with Newman over Newman's evaluation of plaintiff's
12  performance.  (RUF ¶s 192-94, 198.)  Plaintiff believed his
13  "needs improvement" rating from Newman was "unfair," and during a
14  meeting to challenge Newman's evaluation, plaintiff told Newman
15  he had information that Newman's ex-wife was a lesbian.  (RUF
16  ¶s 194-95.)

17  In addition, during this same time period, while on duty in
18  November 2003, plaintiff approached an Officer Olivera, whom
19  plaintiff supervised.  He told Olivera that he could direct
20  Olivera to Newman's 1996 arrest information, suggesting that such
21  information could be "helpful" to Olivera in disputing the
22  department's then pending disciplinary action against Olivera.
23  (RUF ¶s 215-217.)

24  In addition to criticizing Newman, plaintiff also criticized
25  Siemens in briefings and conversations with subordinates
26  regarding Siemens' alleged, unethical conduct in using a police
27  vehicle for personal use.  Such use, defendants contend, was
28  expressly sanctioned by Siemens' employment contract.  (RUF

¶ 180-182.)  Plaintiff never raised any concern about Siemens'
use of the police vehicle to Siemens, the City Council, the City
Manager or the City Attorney.  (RUF ¶ 177.)  However, plaintiff
asserts he reported Siemens' conduct, of allegedly using the
department's vehicle to transport family members and using the
vehicle outside the Rocklin city limits, to his supervisor
Lieutenant Johnstone.  (Id.)

Plaintiff also criticized Siemens for instituting an alleged
illegal incentive program for ticketing motorists for red light
violations.  Plaintiff claimed Siemens illegally rewarded
officers with pizzas, paid for with public funds, as an incentive
to ticket more motorists.  (RUF ¶ 7; Pl.'s Decl., ¶s 51-64.)

Plaintiff believed he had a duty to report this wrongdoing
by Newman and Siemens to his subordinates.  (RUF ¶s 210, 235.)
Plaintiff also asserts, however, that at other times, he was
discouraged from speaking out about wrongdoing within the
department because Siemens expressed contempt for such persons.
(RDF ¶ 7.)  Plaintiff also believed that the City's "Departmental
Directive and Admonition," of January 16, 2003, discouraged
officers from reporting wrongdoing within the department,
including sexual harassment, racial discrimination, or misuse of
public resources.  (RDF ¶ 7, 10, 11, 19, 20, 38.)

On June 30, 2004, after a five-day evidentiary hearing,
plaintiff's internal grievance, pursuant to his union contract,
regarding his 40-hour suspension was denied by arbitrator
Catherine Harris.  (RUF ¶ 89.)  Harris found "just cause" for the
City's 40-hour suspension of plaintiff for violation of the
verbal harassment policy.  (Id.)  Despite this finding, plaintiff

told Sergeant Vizzsi that the arbitrator "slammed" Siemens.  (RUF ¶ 90.)  Plaintiff also told Captain Ruben during an internal affairs interview, on September 15, 2004, that the arbitrator's findings substantiate an "on going pattern" by Siemens of "making accusations that have proven to be false."  (RUF ¶ 239.)

On November 1, 2004, Urrutia issued plaintiff a Notice of Termination setting forth the following charges: (1) plaintiff made malicious and threatening statements to his supervisor Newman on October 13, 2003 during a performance evaluation, including statements concerning the sexual orientation of Newman's ex-wife; (2) during October to December 2003, plaintiff made disparaging remarks about Newman during briefings and in conversations with his subordinates; (3) during that same period, plaintiff made disparaging remarks about Siemens during briefings and in conversations with subordinates; (4) during November 2003, while on duty, plaintiff offered to show a police report about Newman to Olivera to help Olivera in an internal affairs investigation; (5) in September 2004, plaintiff made inappropriate comments about the disposition of his verbal harassment grievance to Sergeant Vizzusi and Lieutenant Johnstone; and (6) plaintiff did not follow the mission of the department and the directions of the Chief of Police, and he refused to strictly adhere to the standards and policies of the department.  (RUF ¶s 54-60.)  The Notice indicated that all six charges described conduct violative of the Rocklin Police Department's Departmental Directive and Admonition, dated January 16, 2003.  (RUF ¶ 62.)

On January 9, 2006, following a seven-day evidentiary hearing, in which 18 witnesses testified and 100 exhibits were moved into evidence, arbitrator William Riker issued a 49-page advisory decision, denying plaintiff's grievance and sustaining each of the six charges against plaintiff contained in the Notice of Termination.  (RUF ¶ 71.)   Riker wrote in relevant part:

> As noted, the preponderance of the evidence indicates that Eaton did commit the acts outlined in the six charges.  These actions also impacted a wide number of officers within the Department who were aware of his behavior.  It is also credible that he did negatively impact the good order and efficiency of the organization.  If he were allowed to remain as a police officer with the City of Rocklin, then his behavior would serve as a benchmark against future violations of such insubordinate and disruptive nature.  It is a recommendation that frankly would be inconsistent with the findings.

(RUF ¶ 72.)

On January 11, 2006, Urrutia issued a letter accepting arbitrator Riker's advisory decision without modification and sustaining plaintiff's termination.  (RUF ¶s 8-9, 68-70, 73.)

Plaintiff disputes the bases for his termination, alleging that he was terminated in retaliation for his (1) testimony before the grand jury, (2) reports and refusal to participate in the alleged, illegal ticket incentive program, (3) reports of alleged violations of <u>Brady</u> based on the department's failure to disclose Newman's criminal history, and (4) reports of alleged illegal use of public funds by the department; specifically, Siemens' personal use of a police vehicle and his implementation of the ticket incentive program.  Plaintiff further contends that Siemens falsified documents to support terminating plaintiff and thereafter committed perjury by testifying in the arbitration

proceedings that certain documents were accurate and valid.   (RDF ¶s 34-36.)   Plaintiff maintains that as a result of his unlawful firing by defendants, he has been unable to obtain other employment in law enforcement.   (RDF ¶s 27, 30; see also generally Pl.'s Decl.)

Finally, plaintiff contends that other department employees were similarly retaliated against for reporting illegal activity by defendants and/or refusing to participate in illegal activities.   In support of this contention, plaintiff proffers evidence through various former department employees' declarations.[8]   The following are statements of such declarations:

(1)   Tia Bostian ("Bostian") started working for the RPD in 1987 as a secretary and moved up from that position to a community service officer, a position she held for 16 years. Over the years, she had excellent performance evaluations. However, she attests that over the course of a ten-year period she was subjected to various forms of sexual harassment by police officer Robert Nunez ("Nunez").   She made multiple reports to her immediate supervisor as well as to Newman but nothing was remedied.   Ultimately, she and another RPD employee, Freda Anderson ("Anderson"), filed a lawsuit against the City for sexual harassment.   After filing the lawsuit, Bostian claims her work became heavily scrutinized and she was assigned manual tasks

---

[8]   This evidence is disputed by defendants, who rely, in large part, on these employees' deposition testimony.   Defendants also make certain legal arguments for why this court should disregard the employees' testimony.   Those arguments are addressed in the court's legal analysis below where appropriate.

such as cleaning up the property and evidence rooms.  After being given a notice of termination in September 2003, Bostian was terminated in October 2003 by Urrutia.  She claims she was terminated in retaliation for filing a civil complaint against the City and for testifying in favor of Anderson in a sexual harassment investigation of Anderson's complaints.  (RDF ¶ 1, 11, 20, 21, 24, 33; Bostian Decl., filed Aug. 21, 2009 [Docket #175].)

        (2)  Anderson, an Animal Control Officer for 18 years, also asserts she endured sexual harassment by Officer Nunez while working for the RPD.  She claims she reported Officer Nunez' conduct to Newman, Siemens and Urrutia but they did nothing. After filing suit against the City with Bostian, Anderson reached a monetary settlement with the City.  However, she asserts the retaliation continued.  Thereafter, Anderson sustained a workplace injury and was taken off work.  Once her doctor cleared her to return to work, Anderson claims the City would not allow her to return in retaliation for pursuing her harassment complaints.  Anderson resigned.  (RDF ¶s 1, 11, 20, 21, 24, 33; Anderson Decl., filed Aug. 21, 2009 [Docket #173].)

        (3)  Bryon Green, a RPD officer, attests that he was subjected to an internal affairs investigation regarding his alleged failure to properly handle evidence, conduct investigations and write police reports, following his provision of favorable testimony to plaintiff.  Green told the City's attorney, during plaintiff's arbitration proceedings concerning his termination, that he witnessed Siemens' alleged, illegal personal use of his assigned police vehicle.  Green reported that

12

1  he observed Siemens in the vehicle, outside the city limits with
2  his wife in the car.  Green claims that thereafter he was
3  subjected to false charges of misconduct by defendants and rather
4  than go through baseless termination proceedings, he resigned.
5  (RDF ¶ 1.)

6       (4)  Dave Kert, the Police Officers Association President
7  and a Dispatcher for the RPD for 17 years, asserts he endured
8  retaliation during his employment with RPD as a result of filing
9  grievances, as Association President, on behalf of police
10  officers and RPD employees against the department.  Kert asserts
11 that Siemens told him that employees were not to go to human
12 resources to report personnel problems but instead should keep
13 such issues within the department.  Kert claims Siemens tried to
14 have him removed as President of the Association and ultimately,
15 instituted an internal affairs investigation of Kert in February
16 2004.  The charges asserted against him were nearly identical to
17 the allegations brought against plaintiff.  After going out on a
18 disability leave, Kert maintains that when he returned to work he
19 was subjected to "re-training" despite having worked in his
20 position for 16 years.  Kert believes this re-training was in
21 retaliation for the grievances he filed as President of the
22 Association against the department.  Kert later resigned.  (RDF
23 ¶s 1, 11, 20, 21, 24, 33; Kert Decl., filed Aug. 21, 2009 [Docket
24 #172].)

25      (5)  Nancy Meuer, a Public Safety Dispatcher for the RPD,
26 attests that in 2005 she found a CD in her "in-box" at work that
27 contained pornography.  She reported the incident to Siemens and
28 an internal affairs investigation was commenced.  The

investigation determined that Nunez copied the CD from the evidence room and mistakenly gave it to Meuer; he had intended to give copies to two other officers.  Meuer claims that Nunez was not disciplined for his conduct.  Meuer asserts she was later retaliated against for complaining about the CD; she later sought to attend the police academy and told Siemens of her interest in the academy, but he told her she "wasn't going anywhere in the department."  (Meuer Decl., filed Aug. 21, 2009 [Docket #174].)

On April 10, 2006, plaintiff filed a petition for writ of mandate in the Placer County Superior Court, asking the court to set aside his termination and to order his reinstatement.  The petition also sought back pay with interest, attorneys' fees and costs, and punitive damages against the City, Urrutia and Siemens, who were named as respondents.  Plaintiff alleged his termination was not supported by the arbitrator's findings, and the findings were not supported by the evidence in light of the entire record.  Plaintiff alleged that in terminating his employment, the City violated plaintiff's constitutional free speech and procedural due process rights as well as his rights under state law under POPBR.  (Mem. & Order, filed May 23, 2007, at 7 [Docket # 24].)[9]

On February 16, 2007, plaintiff filed the instant action in this court against the same defendants, seeking the same relief and damages and asserting the similar claims set forth above.

_____

[9]   Because the parties do not describe these facts in the statements of undisputed and disputed facts, the court cites to its prior order in this case, resolving defendants' motion to dismiss the action on res judicata grounds.  The parties do not appear to dispute these facts on the instant motion.

(Docket #1.)[10]  Plaintiff filed a first amended complaint on
October 10, 2008, which is the operable pleading for this motion.
(Docket # 95.)

On April 26, 2007, plaintiff voluntarily dismissed his
petition for writ of mandate in superior court.  (Mem. & Order,
filed May 23, 2007, at 7.)

<b>STANDARD</b>

The Federal Rules of Civil Procedure provide for summary
judgment where "the pleadings, the discovery and disclosure
materials on file, and any affidavits show that there is no
genuine issue as to any material fact and that the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);
see <u>California v. Campbell</u>, 138 F.3d 772, 780 (9th Cir. 1998).
The evidence must be viewed in the light most favorable to the
nonmoving party.  See <u>Lopez v. Smith</u>, 203 F.3d 1122, 1131 (9th
Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating
the absence of a genuine issue of fact.  See <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 325 (1986).  If the moving party fails to
meet this burden, "the nonmoving party has no obligation to
produce anything, even if the nonmoving party would have the
ultimate burden of persuasion at trial."  <u>Nissan Fire & Marine
Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102-03 (9th Cir. 2000).
However, if the nonmoving party has the burden of proof at trial,

---

[10]    Plaintiff also originally alleged a Section 1983 claim
for violation of his Fifth Amendment criminal due process rights
which was dismissed by the court, on the basis of a lack of
standing to bring such a claim, in the court's Memorandum and
Order of September 22, 2008 (Docket # 93).

15

the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp., 477 U.S. at 325.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.  See Nissan Fire & Marine, 210 F.3d at 1107.  Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

**ANALYSIS**

**A.    Equal Protection Claim**[11]

In his first claim for relief, plaintiff alleges defendants violated his Fourteenth Amendment equal protection rights by establishing different classes of employees for the purpose of imposing discipline.  (FAC ¶ 85.)  Plaintiff alleges the creation

---

[11]    Plaintiff brings each of his constitutional claims pursuant to Section 1983.  Section 1983 does not create any substantive rights but rather provides a vehicle whereby a plaintiff can challenge actions by governmental officials.  To establish a violation of Section 1983, a plaintiff must demonstrate that (1) the action occurred under color of state law and (2) the action resulted in the deprivation of a constitutional right or federal statutory right.  Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002) (internal quotations and citations omitted).  Here, it is undisputed that defendants acted under "color of state law."  The only issue is whether defendants violated plaintiff's constitutional rights, namely, his equal protection, substantive due process and free speech rights.

1  of these different classes resulted in the disparate treatment of

2  similarly situated employees who were part of distinct groups.

3  (Id. at ¶ 85.1.)  More specifically, plaintiff alleges that

4  defendant Siemens repeatedly referred to employees who were

5  willing to violate the law and willing to not report violations

6  of the law by the City and its employees as "team players," and

7  those who would not violate the law and reported violations of

8  the law and suspected violations of the law by defendants as "not

9  team players" (referred to herein as the "non-team players").

10  (Id.)  Defendant Siemens repeatedly encouraged the "non-team

11  players," to "get on the team."  (Id.)

12       Plaintiff alleges he was a member of the "non-team players,"

13  a distinct group of employees who refused to participate in

14  criminal activity and who complained of and reported illegal

15  activity by the City and its employees as mandated by law.  This

16  group, plaintiff alleges, was treated arbitrarily and unfairly in

17  comparison to those other employees, the "team players," who

18  participated in the illegal activity and/or who failed and

19  refused to report the illegal activity by defendants.  (Id. at

20  ¶ 85.2.)

21       In the FAC, plaintiff names certain, specific members of his

22  "non-team players" group.  (Id. at ¶s 85.2, 85.13, 85.14, 85.15,

23  85.16, 85.17, 85.18.)  These employees, plaintiff alleges, also

24  sustained adverse employment actions based on their refusal to

25  participate in criminal activity and/or their reports of illegal

26  activity by the City and its employees.  (Id.)

27       To sustain an equal protection claim, in this action

28  involving public employment, plaintiff must prove *class*-based

1  differential treatment.  In <u>Engquist v. Or. Dept. of Agric.</u>, 128

2  S. Ct. 2148 (2008), the United States Supreme Court invalidated

3  "class-of-one" equal protection claims, previously authorized by

4  <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562 (2000),[12] in the

5  public employment context.  The Court held:

> In short, ratifying a class-of-one theory of equal
> protection in the context of public employment would
> impermissibly 'constitutionalize the employee grievance.'
> 'The federal court is not the appropriate forum in
> which to review the multitude of personnel decisions
> that are made daily by public agencies.'  Public employees
> typically have a variety of protections from just the
> sort of personnel actions about which Engquist complains,
> but the Equal Protection Clause is not one of them.

11 <u>Id.</u> at 2157 (internal citations omitted).  However, the Court in

12 <u>Engquist</u> did not eradicate all equal protection claims by public

13 employees against their public employers.  The Court stated that

14 their prior cases make clear that the "Equal Protection Clause is

15 implicated when the government makes class-based decisions in the

16 employment context treating distinct groups of individuals

17 categorically different."  <u>Id.</u> at 2155 (citing <u>e.g.</u> <u>Beazer</u>, 440

18 U.S. at 593 [upholding city's exclusion of methadone users from

19 employment under rational basis review]; <u>Martin</u>, 440 U.S. at 199-

20 201 [holding classification between teachers who had complied

21 with a continuing-education requirement and those who had not

22 rational and not violative of the Equal Protection Clause]).

23

24     [12]   In <u>Village of Willowbrook</u>, the Court held that an equal
protection claim may be brought by a "class-of-one" where a
25 "plaintiff alleges that [he] has been intentionally treated
differently from others similarly situated and that there is no
26 rational basis for the difference in treatment."  528 U.S. at
564.   In other words, a plaintiff does not have to allege
27 membership in any particular class, so long as the plaintiff
alleges he was arbitrarily treated differently from other
28 similarly situated employees.  <u>Id.</u>

What is foreclosed by the Court's decision is claims that allege simply *individualized*, subjective personnel decisions that were made on an arbitrary and irrational basis.  Id.  To be viable as an equal protection claim, a public employee plaintiff must establish some *class*-based treatment where a distinct *group* of individuals is treated differently.

Here, plaintiff has proffered sufficient evidence to raise a triable issue of fact that defendants treated the "non-team players," a distinct group of individuals, categorically different than the "team players," and that such differential treatment, whereby the non-team players were disciplined more harshly, was without a rational basis.  The declarations and/or deposition testimony of plaintiff, Green, Bostian, Anderson and Kert, provide numerous examples of how they, as members of the non-team players' group, were treated less favorably than employees in the team players group, who participated in illegal activity and did not report wrongdoing by defendants.  (RUF ¶s 1, 11, 20, 21, 24, 33.)[13]

For example, plaintiff describes how he was brought up on charges and punished by defendants as a result of a conversation

---

[13]    As described above, plaintiff also submits the declaration of Nancy Meuer, another claimed member of the non-team players' group.  Defendants object to her declaration on the ground that plaintiff never disclosed Meuer as a member of the alleged class.  Defendants' objection is sustained as it does not appear from the papers submitted on the motion that plaintiff previously disclosed Meuer.  Defendants similarly object to Dave Kert's declaration; however, plaintiff did disclose Kert in response to defendants' interrogatory request asking for all persons who were allegedly discriminated against for reporting wrongdoing by defendants or refusing to participate in illegal activity.  Therefore, the court does consider Kert's declaration as evidence in support of this claim.

he had with another officer about her feelings and beliefs regarding having had a breast augmentation; plaintiff asserts that other employees, including Lt. Johnstone, who were part of the "team players" group, were not similarly punished for the same type behavior.  In another example, plaintiff describes that he was ultimately terminated for having revealed violations of law and criminal activity by the City and its employees, yet other employees, like Steve Newman, were hired and promoted despite convictions for, among other things, theft of police evidence.  (Id.; See generally Pl.'s Decl.)

Similarly, Green describes that he told the truth and refused to participate, at defendants' counsel's urging, in creating and making false statements against plaintiff during arbitration proceedings, and as a result, he was brought up on disciplinary charges.  Green ultimately felt compelled to resign in lieu of going through his own termination proceedings.  Green also told defendants' counsel that he witnessed defendant Siemens' illegal, personal use of an assigned police vehicle; Green further told defendants' counsel about the City's alleged unlawful red light ticket incentive program.  After providing this truthful information, Green asserts he was brought up on false disciplinary charges.  (RDF ¶ 1.)

Bostian complained of sexual harassment and within one year of her complaint she was fired; Bostian also was charged with dishonesty and moral turpitude for her personal use of department computers.  Unlike Bostian, plaintiff emphasizes Nunez received only minor discipline and was permitted to retain his job despite his distribution of pornographic evidence made on department

1  computers.  (See generally Bostian Decl.[14] and Meuer Decl.)

2      Plaintiff also proffers Anderson as a member of the "non-

3  team players" group.  After Anderson sustained two on-duty work

4  injuries, defendants challenged her fitness to return to duty as

5  an Animal Control Officer and ultimately, Anderson asserts,

6  precluded her from returning to work because she was prepared to

7  give favorable testimony to plaintiff in his arbitration

8  proceedings.  (See generally Anderson Decl.)

9      Finally, Kert attests that he was retaliated against for

10  bringing grievances against the department on behalf of RPD

11  employees.  Kert maintains that as a result of his role as Police

12  Association President, Siemens brought false charges against him

13  which were nearly identical to the charges made against

14  plaintiff.  Kert contends that he was forced to "re-train" at the

15  position he had held for 16 years in retaliation for his lawful

16  actions in bringing grievances against the department.  (See

17  generally, Kert Decl.)

18      Defendants respond to this evidence, arguing in the first

19  instance, that plaintiff cannot rely on these RPD employees'

20  testimony because he conceded during his deposition that, while

21  employed with the RPD, he had no knowledge of these employees'

22  circumstances--their conduct or defendants' alleged response

23  thereto.  (RUF ¶s 274-278.)  Contrary to defendants' argument,

24

25      [14]  Defendants' legal objection to Bostian's declaration,
   on the grounds that her allegations are barred by collateral
26  estoppel principles based upon underlying administrative
   proceedings, is unavailing.  Defendants have not only failed to
27  fully brief this issue, they fail to adequately support their
   arguments with citation to evidence from those alleged
28  administrative proceedings.

1  however, such knowledge is not required for plaintiff to

2  establish a class of persons who suffered differential treatment

3  by defendants.  Enqquist, 128 S. Ct. at 2155.  While plaintiff

4  may not have known, at the time, that any other employees were

5  treated similarly to him, he has now marshaled such evidence by

6  this lawsuit and submits it to the court in opposition to the

7  pending motion.  Defendants' argument is unavailing.

8       Defendants further respond to plaintiff's evidence by citing

9  plaintiff's and the various declarant employees' deposition

10  testimony, arguing that their declarations submitted in

11  opposition to the motion are contradicted by their deposition

12  testimony.  (See e.g., RUF ¶ 306-307, 309-318, 320-324.)  To the

13  extent such conflicts exist, however, the court does not find

14  that the conflicts are direct, and thus, there is no basis to

15  disregard the declarations.  Cf. Mesirow v. Pepperidge Farm,

16  Inc., 703 F.2d 339, 344 (9th Cir. 1983) (recognizing that

17  statements in affidavits that directly conflict with prior

18  deposition testimony must be disregarded and cannot serve to

19  defeat summary judgment).  Instead, defendants' citation to

20  certain deposition testimony of the declarants, including

21  plaintiff, establishes, at most, a credibility dispute that the

22  jury must decide.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

23  249-55 (1986) (holding that credibility determinations, weighing

24  of evidence and drawing legitimate inferences from the facts are

25  jury functions); SEC v. Koracorp Industries, 575 F.2d 692, 699

26  (9th Cir. 1978) (holding that summary judgment should be denied

27  where an issue of material fact cannot be resolved without

28  observation of the demeanor of witnesses to evaluate

22

credibility).

Thus, the court must deny defendants' motion as to plaintiff's equal protection claim.  Triable issues of fact remain as to whether defendants discriminated against a distinct group of employees, of which plaintiff was a member, by treating plaintiff's group categorically different than other similarly situated employees, in imposing discipline and rendering decisions to terminate employees.

Alternatively, defendants argue that individual defendants, Siemens and Urrutia, are entitled to qualified immunity, and thus, the court can grant summary judgment in their favor on this claim.  Public officials are entitled to qualified immunity for acts that do not violate "clearly established . . . constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Prior to the United States Supreme Court's decision in Pearson v. Callahan, 129 S. Ct. 808 (2009), when considering a defendant's motion for summary judgment on the ground of qualified immunity, a court had to consider as "[t]he threshold question . . . whether, taken in the light most favorable to the party asserting injury, the facts alleged show that the officer's conduct violated a constitutional right."  Bingham v. City of Manhattan Beach, 329 F.3d 723, 729 (9th Cir. 2003), *superceded by* 341 F.3d 939 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  If a violation could be made out, the next step was to determine whether the right violated or the law governing the official's conduct was clearly established such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation

23

1  he confronted." Id. (quoting Saucier, 533 U.S. at 202); Act

2  Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir. 1993).

3  However, in Pearson, the Court held that consideration of the

4  issues in this sequence is no longer mandatory.  129 S. Ct. at

5  818.  Rather, judges may exercise their "sound discretion in

6  deciding which of the two prongs of the qualified immunity

7  analysis should be addressed first in light of the circumstances

8  in the particular case."  Id.  Ultimately, where a defendant's

9  conduct violates constitutional rights and the law is clearly

10  established, the defendant may not claim qualified immunity.

11      For a constitutional right to be clearly established, "its

12  contours must be sufficiently clear that a reasonable [officer]

13  would understand that what he is doing violates that right at the

14  time of his conduct." Eng v. Cooley, 552 F.3d 1062, 1075 (9th

15  Cir. 2009) (internal quotations and citation omitted).  Thus, the

16  Supreme Court held in Saucier that: "The relevant, dispositive

17  inquiry in determining whether a right is clearly established is

18  whether it would be clear to a reasonable officer that his

19  conduct was unlawful in the situation he confronted.  If the law

20  did not put the officer on notice that his conduct would be

21  clearly unlawful, summary judgment based on qualified immunity is

22  appropriate."  533 U.S. at 201-02.

23      For the reasons set forth above, the court finds that

24  plaintiff has proffered sufficient evidence to raise a triable

25  issue of fact that Siemens and Urrutia violated plaintiff's equal

26  protection rights in disciplining and ultimately terminating him

27  without a rational basis.  Although the law with respect to equal

28  protection claims in public employment changed in 2008 with the

24

1    United States Supreme Court's decision in <u>Engquist</u>, it was,

2    nonetheless, clearly established at the time of plaintiff's

3    employment with the RPD, that defendants could not treat

4    plaintiff arbitrarily different than other similarly situated

5    employees in imposing discipline.  <u>Village of Willowbrook</u>, 528

6    U.S. at 564 (permitting "class-of-one" equal protection claims

7    where a plaintiff could demonstrate that he was intentionally

8    treated differently from others similarly situated and there was

9    no rational basis for the difference in treatment).  <u>Engquist</u>

10   limited such rights by a public employee plaintiff, requiring

11   *class*-based differential treatment, but plaintiff's basic right

12   to equal treatment in his public employment was clearly

13   established, pursuant to <u>Village of Willowbrook</u>, and thus,

14   defendants are not entitled to qualified immunity.[15]

15        Finally, defendants argue that even if plaintiff can sustain

16   an equal protection claim against Siemens and Urrutia, he cannot

17   maintain a claim against the City, pursuant to <u>Monell</u>, because

18   plaintiff has no evidence of a formal policy or long-standing

19   practice or custom of the City to discriminate against employees

20   for reporting violations of law or encouraging illegal activity

21   or evidence that a final-policy maker for the City ratified any

22   such conduct.  In <u>Monell</u>, the Supreme Court held that

23   municipalities are "persons" subject to damages liability under

24   Section 1983 where "action pursuant to official municipal policy

25   _____

26        [15]   Defendants' citation to arbitrator Riker's advisory
     decision as *evidence* establishing a lack of a constitutional
     violation and/or clearly established "law" is wholly inapposite.
27   Riker's findings are not binding on this court, and thus, his
     decision is not evidence of the legality of defendants' actions
28   or law which this court must apply to this case.

of some nature cause[s] a constitutional tort." Id. at 691. The

Court made clear that the municipality itself must cause the

constitutional deprivation and that a city may not be held

vicariously liable for the unconstitutional acts of its employees

under the theory of respondeat superior. Id. Thus, the Ninth

Circuit has recognized that under Monell, a plaintiff may

establish municipal liability in one of three ways:

> First, the plaintiff may prove that a city employee
> committed the alleged constitutional violation pursuant
> to a formal governmental policy or a longstanding practice
> or custom which constitutes the standard operating
> procedure of the local governmental entity. Second,
> the plaintiff may establish that the individual who
> committed the constitutional tort was an official with
> final policy-making authority and that the challenged
> action itself constituted an act of official governmental
> policy. [T]hird, the plaintiff may prove that an official
> with final policy-making authority ratified a subordinate's
> unconstitutional decision or action and the basis for it.

Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992)

(internal citations and quotations omitted).

Here, based on the evidence set forth above, plaintiff has

sufficiently raised a triable issue of fact that the City had a

"widespread practice" of discriminating against "non-team

players" such that the practice became the custom of the City.

Id. at 1348. A Section 1983 plaintiff may attempt to prove the

existence of a custom or informal policy with evidence of

repeated constitutional violations by the municipality. See

McRorie v. Shimoda, 795 F.2d 780, 784 (9th Cir. 1986). Plaintiff

has done so, presenting evidence of a pattern of similar

disciplinary actions or dismissals in violation of RPD employees'

equal protection rights. The court therefore cannot grant

1  summary judgment in the City's favor on the basis of <u>Monell</u>.[16]

2  **B.   Substantive Due Process Claim**

3       In his second claim for relief, plaintiff alleges that "the

4  conduct and statements of [defendants] have deprived plaintiff of

5  his chosen profession and that said findings, charges and

6  statements have been and are false and fraudulent."  (FAC ¶ 95.)

7  Plaintiff also alleges that defendants, due to "'malicious,

8  irrational and/or plainly arbitrary' motivations have taken the

9  property interest of plaintiff in [his] career and deprived him

10 of the opportunity for future employment by means of repeatedly

11 charging plaintiff with moral turpitude when no such conduct

12 occurred, with the concurrent effect of eliminating opportunity

13 for plaintiff to work as a police officer in any other

14 department."  (FAC ¶ 96.)

15      Defendants move for summary judgment, arguing plaintiff

16 lacks evidence to substantiate these allegations and prove a

17 substantive due process violation for deprivation of one's chosen

18 profession.  To sustain a substantive due process claim, a

19 plaintiff must establish facts demonstrating a deprivation of

20 "life, liberty or property in such a way that shocks the

21 conscience or interferes with rights implicit in the concept of

22 ordered liberty."  <u>Nunez v. City of Los Angeles</u>, 147 F.3d 867,

23 871 (9th Cir. 1998).  The Ninth Circuit has recognized a

24 plaintiff's liberty interest in pursuing an occupation of his

25

26      [16]   Because plaintiff raises sufficient evidence to press a
   <u>Monell</u> claim against the City under the "longstanding practice or
27 custom" theory of liability, the court need not reach, for
   purposes of this motion, whether plaintiff could also establish
   liability based on a "formal policy" or ratification by a final
28 policy-maker.

1  choice.  Lowry v. Barnhart, 329 F.3d 1019, 1023 (9th Cir. 2002).

2  In that regard, the Ninth Circuit has held that "a plaintiff can

3  make out a substantive due process claim if [he] is unable to

4  pursue an occupation and this inability is caused by government

5  actions that are arbitrary and lacking a rational basis."

6  Engquist v. Or. Dept. of Agriculture, 478 F.3d 985, 997 (9th Cir.

7  2007).  However, the Ninth Circuit has expressly limited

8  occupational liberty claims, under the substantive due process

9  clause:

10          to extreme cases, such as government blacklist, which
            when circulated or otherwise publicized to prospective
11          employers effectively excludes the blacklisted individual
            from his occupation, much as if the government had yanked
12          the license of an individual in an occupation that requires
            licensure.
13

14  Id. at 997-98 (citation and internal quotation omitted).

15          To determine how significant the government's interference

16  with a plaintiff's job prospects must be to constitute a denial

17  of the right to pursue a profession, the court in Engquist

18  expressly adopted the standard set forth by the Seventh Circuit

19  in Bordelon v. Chi. Sch. Reform Bd., 233 F.3d 524 (7th Cir.

20  2000).  Id. at 998.  There, the Seventh Circuit held, that to

21  bring an occupational liberty claim, a plaintiff must prove that

22  the "character and circumstances of a public employer's

23  stigmatizing conduct or statements are such as to have destroyed

24  an employee's freedom to take advantage of other employment

25  opportunities."  Bordelon, 233 F.3d at 531.  It is not enough

26  that the employer's conduct had some adverse effect on the

27  employee's job prospects.  "Instead, the employee must show that

28  the stigmatizing actions make it virtually impossible for the

28

employee to find new employment in his chosen field." <u>Id.</u>

Here, plaintiff fails to proffer sufficient evidence to raise a triable issue of fact that defendants' actions in terminating plaintiff have made it "virtually impossible" for plaintiff to find new employment in the law enforcement field. <u>Id.</u> First, plaintiff's opposition to the motion is premised on an unsupported assertion:  that he was terminated for *dishonesty.* However, plaintiff admits the Notice of Termination did not charge him with dishonesty--none of the six factual charges against him in the Notice allege he made false, misleading or dishonest statements.  (RUF ¶s 342-343.)  Moreover, plaintiff admits that none of arbitrator Riker's findings of fact, sustaining the six factual charges, conclude that plaintiff made a dishonest or false statement.  (RUF ¶ 344.)  Thus, to the extent plaintiff bases this claim on an allegation that defendants' actions have precluded him from obtaining future employment due to charges of dishonesty, that allegation is wholly unsupported.

Furthermore, plaintiff otherwise fails to proffer evidence demonstrating that defendants' actions have "destroyed" his ability to work in law enforcement.  <u>Bordelon</u>, 233 F.3d at 531. Indeed, the evidence suggests to the contrary.  In the five years since plaintiff's termination, he applied for employment with four law enforcement agencies.  (RUF ¶ 346.)  Of those four applications, plaintiff received two interviews for employment with the Clovis Police Department and the California Office of Emergency Services.  (RUF ¶ 347, 350.)  Although plaintiff was not ultimately offered employment by these agencies, the agencies

1  did not tell plaintiff why he did not get an offer of employment

2  and plaintiff did not ask.  (Id.)

3       Plaintiff admits that he has not applied for any law

4  enforcement jobs since 2006, stating that he felt it was "futile

5  at this point."  However, no law enforcement agency has informed

6  plaintiff that its decision not to hire plaintiff had anything to

7  do with his discharge from the RPD.  (RUF ¶ 346.)

8       Even considering this evidence in the light most favorable

9  to plaintiff, it is insufficient to meet plaintiff's significant

10 burden in this case.[17]  The Ninth Circuit has made clear that

11 occupational liberty claims, under the substantive due process

12 clause, are sustainable only in "extreme cases," such as a

13 government blacklist, where a plaintiff can show a "complete

14 prohibition on entry into a profession."  Engquist, 478 F.3d at

15 998.  The facts, here, clearly do not rise to that level.  See

16 e.g. Id. (finding an allegedly inadequate and selective

17 investigation leading to the plaintiff's termination inadequate

18 to prove an occupational liberty violation under the substantive

19 due process clause); Scruggs v. Josephine County Sheriff's Dep't,

20 2008 WL 608581, *15 (D. Or. Mar. 4, 2008) (finding the

21 plaintiff's evidence, that the defendants may have communicated

22 to prospective law enforcement employers that the plaintiff was

23

24      [17]  Plaintiff cannot properly rely on the declaration of
   William Hertoghe to establish facts demonstrating why as a result
25 of his termination from RPD, plaintiff has become ineligible for
   future work in law enforcement.  Plaintiff attempts to offer
26 expert opinion testimony from Hertoghe but plaintiff did not
   designate Hertoghe as a retained expert in this case.  (See
27 Defs.' Objs. to Hertoghe Decl. [Docket #187], filed Sept. 15,
   2009.)  As such, the court does not consider Hertoghe's
28 declaration.

1  terminated for leaking confidential information, insufficient as
2  a matter of law to establish a substantive due process violation
3  since such evidence did not "rise to the requisite level" of
4  demonstrating "stigmatizing" conduct amounting to a "government
5  blacklist which excludes [a] plaintiff from her chosen
6  profession"); Hogan v. Calvin-Smith, 2008 WL 183077, *6 (D. Or.
7  Jan. 16, 2008) (finding the plaintiff's declaration attesting
8  that the defendants made false or misleading statements to third
9  parties regarding the plaintiff's history of personal
10 relationships with inmates and "her belief" that these statements
11 made it impossible for her to get employment insufficient to
12 establish a substantive due process violation).

13      As recognized in these cases, the stigma of being fired,
14 alone, even for false reasons, does not establish a substantive
15 due process violation.  See e.g. Scruggs, 2008 WL 608581, *14.
16 Because the evidence in the record is insufficient to support the
17 conclusion that plaintiff, in this case, has been the subject of
18 a *de facto* government blacklist, or has otherwise been barred
19 from the pursuit of any profession, his occupational liberty
20 claim must fail at summary judgment as a matter of law.
21 Defendants' motion as to this claim is GRANTED.

22      C.   **Free Speech Claim**
23      Defendants move for summary judgment as to plaintiff's third
24 claim for relief for violation of plaintiff's First Amendment
25 free speech rights, arguing plaintiff cannot establish a
26 retaliation claim because (1) he did not engage in speech
27 protected by the First Amendment; and (2) even if he did,
28 plaintiff cannot demonstrate that his speech was a substantial or

motivating factor in defendants' decision to terminate him.  To establish a claim for retaliation in violation of free speech rights, a public employee plaintiff must demonstrate: (1) he engaged in constitutionally protected speech; (2) the employer took adverse employment action against the employee; and (3) the employee's speech was a "substantial or motivating" factor in the adverse action.  Freitag v. Ayers, 468 F.3d 528, 543 (9th Cir. 2006).  The first and third elements are at issue on this motion as the parties do not dispute that defendants' took adverse employment action against plaintiff when they terminated him.

As to the first issue, whether plaintiff engaged in protected speech, the court must engage in a three-step analysis: First, the court must determine whether plaintiff spoke as a citizen or an employee.  Garcetti v. Ceballos, 126 S.Ct. 1951 (2006).  Second, the court must determine whether, in light of the content, form and context of the speech, it touched on matters of public concern.  Connick v. Meyers, 461 U.S. 138, 146 (1983).  Third, the court must determine whether the value of the employee's speech outweighs "the government's interest in the effective and efficient fulfillment of its responsibilities to the public."  Id. at 150.  Ordinarily, these are questions of law for the court to decide.  Id. at 148 n. 7.

Defendants contend that plaintiff's speech was not made in his capacity as a citizen but in the context of his employment. The Supreme Court, in Garcetti v. Ceballos, addressed the issue of whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties.  The plaintiff, Ceballos, was a deputy district

32

attorney employed as a calendar deputy with supervisory
responsibilities. <u>Garcetti</u>, 126 S.Ct. at 1955. Pursuant to his
duties, he investigated a complaint from a defense attorney
regarding inaccuracies in an affidavit used to obtain a search
warrant. <u>Id.</u> at 1955-56. Following his investigation, Ceballos
prepared a memo outlining his concerns with the affidavit and
recommending that the case be dismissed. <u>Id.</u> Ceballos' memo
prompted a meeting with his supervisors and members of the
sheriff's department that allegedly became very heated. <u>Id.</u> at
1956. In spite of Ceballos' concerns, the district attorney's
office decided to proceed with the prosecution. <u>Id.</u> Thereafter,
during a hearing on a motion challenging the warrant, Ceballos
was called by the defense to testify about his observations, but
the trial court upheld the warrant. <u>Id.</u> Ceballos claimed that
he was subsequently subjected to retaliation, including a
transfer and denial of a promotion. <u>Id.</u>

　　　The Court found that the controlling factor in determining
whether Ceballos' speech was protected was that his expressions
were made pursuant to his official duties as a calendar deputy.
<u>Id.</u> at 1960. Part of Ceballos' responsibilities were to
investigate concerns and advise his supervisors regarding pending
cases, a fact that was not disputed by the parties. <u>Id.</u> Under
these circumstances, the Supreme Court concluded "when public
employees make statements pursuant to their official duties, the
employees are not speaking as citizens for First Amendment
purposes, and the Constitution does not insulate their
communications from employer discipline." <u>Id.</u>

Ceballos thus reveals that the "critical inquiry" in addressing whether plaintiff's speech in this case was protected is plaintiff's job responsibilities (i.e., was his speech made "pursuant to [his] official duties"). Freitag, 468 F.3d at 545 (emphasizing the distinction between speech *attendant to* a public employee's official duties and speech *about* the subject of a public employee's employment and holding that only the former is not protected speech under Ceballos).

Here, by his complaint and deposition testimony, plaintiff admits his speech in this case was made pursuant to his official duties as a police sergeant. In the first amended complaint, plaintiff alleges he was "terminated by the [RPD] as retaliation for acting in a manner *required* of a police officer and reporting suspected violations of law to government agencies." Plaintiff claims further: "As a police officer . . . [he] was *required* by law to report such violations truthfully when compelled to testify before the Grand Jury, and when observing such violations to his superiors within the [RPD]." (RUF ¶ 233; FAC ¶ 17.) Moreover, plaintiff alleges his reports of wrongdoing by defendants were "*mandated by [his] duties as a police sergeant*." (RUF ¶ 234; FAC ¶ 39.) Plaintiff reaffirmed these allegations in his deposition, testifying that he had a "duty" as a police officer to report unlawful activities of the RPD. (RUF ¶ 235.)

Both plaintiff's deposition testimony and his statements, made in his pleading in this case, constitute binding judicial admissions. Schneider v. TRW, 938 F.2d 986, 1001 (9th Cir. 1991) (recognizing that a party's deposition testimony is not hearsay since it qualifies as an *admission* of a party-opponent);

34

American Title Insur. Co. v. Lacelaw Corp., 861 F.2d 224, 226
(9th Cir. 1988) (holding that "factual assertions in pleadings
and pretrial orders, unless amended, are considered judicial
admissions conclusively binding on the party who made them");
accord California Sansome v. U.S. Gypsum, 55 F.3d 1402, 1408 (9th
Cir. 1995).

     Plaintiff's citation to Marable v. Nitchman, 511 F.3d 924,
932-33 (9th Cir. 2007) is inapposite.  While the court there
found that the plaintiff engineer did not have an official job
duty to report "his superiors' allegedly corrupt . . . schemes,"
here, plaintiff concedes he had such duties as a police sergeant.
Plaintiff admissions in both his pleading and deposition render
this case wholly different than Marable where the court found a
lack of evidence to demonstrate Marable had a duty to report
wrongdoing by his superiors.  Id.

     Because plaintiff did not speak as a citizen, in making his
reports of wrongdoing by defendants, he cannot sustain a First
Amendment retaliation claim.  The court's analysis may properly
end here.  However, the court also remarks briefly on the other
two requirements for finding that a plaintiff engaged in
protected speech, as plaintiff also cannot clearly establish
these requirements.

     Plaintiff's speech, in this case, did not address matters of
public concern.  A public employee addresses a matter of public
concern when his speech relates to an issue of "political,
social, or other concern to the community."  Connick, 461 U.S. at
146.  "Speech that concerns issues about which information is
needed or appropriate to enable the members of society to make

informed decisions about the operation of their government merits
the highest degree of first amendment protection."  Coszalter v.
City of Salem, 320 F.3d 968, 973 (9th Cir. 2003).  In contrast,
"speech that deals with individual personnel disputes and
grievances and that would be of no relevance to the public's
evaluation of the performance of governmental agencies, is
generally not of public concern."  Id.

       In defining the scope of First Amendment protection afforded
to public employees' speech, the Supreme Court has distinguished
between speech "as a citizen upon matters of public concern" at
one end and speech "as an employee upon matters only of personal
interest" on the other.  Connick, 461 U.S. at 147.  Thus, the
relevant inquiry under Connick is the point of the speech in
question--was it the employee's point to bring wrongdoing to
light or was the point to further some purely private interest?
Roth v. Veteran's Admin. of United States, 856 F.2d 1401, 1406
(9th Cir. 1988).

       In this case, plaintiff's speech was made in the context of
"a workplace power struggle," as part of plaintiff's personnel
disputes and grievances with his employer.  Desrochers v. City of
San Bernadino, 572 F.3d 702, 710 (9th Cir. 2009) (holding that in
assessing whether speech was on a matter of public concern,
courts will consider whether the speech was made to further some
purely private interest and whether the speech was made in the
context of a workplace power struggle).  Plaintiff only raised
Newman's criminal history with Siemens *after* Siemens was promoted
to be plaintiff's supervisor, and plaintiff raised the issue
while he was currently challenging the City's disciplinary action

against him for violation of the City's verbal harassment policy.
(RUF ¶s 141-157, 159-168, 172-75.)   Similarly, plaintiff spoke
out about Siemens' alleged illegal institution of the red light
ticket quota program in response to his negative performance
review.   Plaintiff was dissatisfied with his negative performance
rating and he responded with a memorandum entitled "Response to
Annual Performance Evaluation."   That memorandum, containing
allegations against Siemens relating to the ticket quota program,
concerned plaintiff's own personnel disputes and grievances with
the City.   (RUF ¶ 183-208.)   It was not directed at informing the
public of any wrongdoing by the City.   See e.g. Desrochers, 572
F.3d at 714 (recognizing that speech that takes the form of an
internal employee grievance is not protected speech because "the
public was never made aware" of the employee's concerns).   In
Desrochers, the Ninth Circuit emphasized that private speech
"motivated by an office grievance is less likely to convey the
information that is prerequisite for an informed electorate," and
thus, not speech of a public concern.   Id.; see also Marr v.
Anderson, 611 F. Supp. 2d 1130, 1140 (D. Nev. 2009) (finding the
plaintiff's speech, made in response to his employer's inspection
of the plaintiff's aircraft and his flight preparedness, not of a
public concern since there was no evidence the plaintiff spoke
out about problems with the inspections until his own conduct
came under scrutiny).

     Also significantly, plaintiff's speech in this case was made
internally--*solely* within the department.   See Desrochers, 572
F.3d at 710 (recognizing that "[i]n a close case, when the
subject matter of a statement is only marginally related to

37

issues of public concern, the fact that it was made because of a grudge or other private interest or to coworkers rather than to the press may lead the court to conclude the statement does not substantially involve a matter of public concern"). Plaintiff raised issues about Newman's criminal history to Siemens and subordinate officers; plaintiff concedes he did not inform the public about Newman's criminal history but instead brought it to Siemens' attention out of concern for the City's potential liability, if Newman's history was revealed and it jeopardized the department's cases. (RUF ¶s 158-160.) He complained of Siemens' alleged illegal activity to a supervisor and subordinate officers. Plaintiff's speech was thus not directed at the public, nor was it made in any context in which it would reasonably be communicated to the public. Desrochers, 572 F.3d at 710 (recognizing that speech of a public concern "enable[s] the members of society to make informed decisions about the operation of their government").

Therefore, for all of these reasons, the court finds that plaintiff's speech in this case was not of a public concern.[18] Plaintiff's speech was made in the context of an "internal

---

[18]   To the extent plaintiff seeks to base his First Amendment claim on his testimony given to the grand jury, his claim cannot succeed. Plaintiff has no evidence to establish that he was terminated in 2004 as a result of his 2000 testimony before the grand jury. Plaintiff admits that his grand jury testimony did not involve defendants herein, and he concedes he never discussed that testimony with Siemens or Urrutia. He further admits he has no evidence that Siemens or Urrutia were motivated to terminate him because of his grand jury testimony, and he acknowledges that the Notice of Termination and arbitrator's decision, validating the termination, did not reference plaintiff's testimony before the grand jury. (RUF ¶ 76-82.)

1  [personnel] dispute with no wider societal implications" and

2  thus, his speech did not raise a matter of public concern.  <u>Id.</u>

3  at 717.  Instead, his speech "falls within the genre of

4  'personnel disputes and grievances' which are not

5  constitutionally significant."  <u>Id.</u>

6      Finally, even if plaintiff's speech was given as a citizen

7  and concerned public matters, it is not constitutionally

8  protected unless the court finds that plaintiff's First Amendment

9  interests outweighed the public employer's interests "in

10 promoting workplace efficiency and avoiding workplace

11 disruption."  <u>Ceballos v. Garcetti</u>, 361 F.3d 1168, 1173 (9th Cir.

12 2004), <i>overruled on other grounds</i>, 126 S.Ct. 1951 (2006).  "The

13 employer bears the burden of proving that the balance of

14 interests weighs in its favor."  <u>Id.</u>  The balancing inquiry is a

15 question of law when applied to undisputed underlying facts.  <u>Eng</u>

16 <u>v. Cooley</u>, 552 F.3d 1062, 1072 (9th Cir. 2009).  In exercising

17 the so-called "<u>Pickering</u>" balancing test, the Ninth Circuit has

18 made clear that "courts should not require government employers

19 to demonstrate that the employee's speech actually disrupted

20 efficient office operation; rather, 'reasonable predictions of

21 disruption' are sufficient."  <u>Moran v. Washington</u>, 147 F.3d 839,

22 846 (9th Cir. 1998).

23     In similar contexts, courts have recognized that legitimate

24 administrative interests outweigh a law enforcement officer's

25 First Amendment rights to make disparaging statements concerning

26 superiors, particularly when directed at department subordinates.

27 <u>See e.g.</u> <u>Id.</u> (holding that "[t]he First Amendment simply does not

28 constitutionalize insubordination"); <u>Pool v. Vanrheen</u>, 297 F.3d

899, 906 (9th Cir. 2002) (affirming summary judgment in favor of
the sheriff's department on the deputy sheriff's free speech
claim concerning a letter she wrote to a newspaper criticizing
the sheriff's department's handling of an investigation and
finding that the letter "detrimentally affected the functioning
of the Sheriff's Office" and the department's decision to demote
the deputy and decrease her pay was "well within the latitude
afforded to public employers to maintain effective management");
Kannisto v. San Francisco, 541 F.2d 841, 842-44 (9th Cir. 1976)
(affirming dismissal of police lieutenant's First Amendment claim
after he was suspended for stating during a briefing to
subordinates that his superior was the most "unreasonable,
contrary, vindicative individual," whose behavior was
"unreasoanble, belligerent, arrogant, contrary and unpleasant");
Gray v. County of Tulare, 32 Cal. App. 4th 1079, 1092-95 (1995)
(finding the sheriff was justified in terminating the plaintiff
deputy because his statements, alleging the sheriff was misusing
public resources, substantially disrupted the efficient operation
of the department since the plaintiff's position required that he
and the sheriff continue working together and the plaintiff's
conduct created dissension and mistrust in the department and
impaired the sheriff's ability to manage).

Similarly here, defendants proffer evidence of both actual
disruption caused by plaintiff's conduct and evidence which
supports a finding that further disruption was likely to occur
absent plaintiff's removal from the department.  Defendants
proffer evidence from numerous officers who testified in
plaintiff's administrative hearing or provided statements during

internal affairs investigations that plaintiff's disparaging
comments about Newman, Siemens and Urrutia affected them
negatively, as they lost trust in these officers and in the
department generally.  (<u>See</u> Decls. of Olivera, Finney, Alford,
Seawell, Craft, filed July 24, 2009 [Docket #s 148-151, 153].)
Some of these officers attest, in declarations filed in support
of the motion, that plaintiff's remarks created a negative
workplace and they became afraid of "crossing" plaintiff for fear
of what he might do to them.  The officers testified that
plaintiff's actions drastically hurt the department's morale.
(RUF ¶ 210-228.)  Finally, Urrutia attests that in deciding to
terminate plaintiff, he relied, in part, on arbitrator Riker's
findings that plaintiff's actions impacted a wide number of
officers within the department and that plaintiff's actions
negatively impacted the good order and efficiency of the RPD.
(RUF ¶ 208-209).

        Considering this evidence, the court must find on balance,
under the circumstances here, that defendants' interests in the
good order and efficiency of the RPD outweighed plaintiff's First
Amendment rights to voice complaints about his superiors.  As the
Ninth Circuit recognized in <u>Pool</u>, "[d]iscipline and esprit de
corps are vital to [a law enforcement department's] functioning."
Thus, a "wide degree of deference to the [law enforcement
department's] judgment is appropriate when close working
relationships are essential to fulfilling public
responsibilities."  297 F.3d at 909.

        Because the court finds that plaintiff did not engage in
protected speech, defendants' motion as to this claim must be

GRANTED.  The court need not consider the other bases for
defendants' motion, addressing the other elements of a first
amendment retaliation claim.

    **D.**   **State "Whistle-blower" & POPBR Claims**

    In his fifth and sixth claims for relief, plaintiff asserts
that defendants violated California Labor Code §§ 1102.5 *et seq*.
and POPBR, California Government Code §§ 3300 *et seq*.,
respectively.  Defendants argue that these state law claims are
barred because plaintiff failed to exhaust judicial remedies by
challenging the arbitrator's administrative decision,
recommending his termination, through a writ of mandate to the
superior court.[19]  (Defs.' MSJ at 46.)

    The California Supreme Court has held that "unless a party
to a quasi-judicial proceeding challenges the agency's adverse
findings made in that proceeding, by means of a mandate action in
a superior court, those findings are binding in later civil
actions."  <u>Johnson v. City of Loma Linda</u>, 24 Cal. 4th 61, 69-70,
76 (2000) (holding that a public employee must petition the
superior court for a writ of administrative mandate and have the
adverse administrative finding set aside before asserting Fair
Employment and Housing Act ["FEHA"] claims); <u>see also</u> <u>Westlake</u>
<u>Cmty. Hosp. v. Super. Ct.</u>, 17 Cal. 3d 465, 483-84 (1976) (holding

---

    [19]   Under the doctrine of judicial exhaustion, a plaintiff
who receives an adverse finding in a final administrative order
or decision must first petition to the superior court for a writ
of administrative mandate pursuant to California Code of Civil
Procedure § 1094.5.  <u>See</u> <u>State Board of Chiropractic Examiners v.</u>
<u>Super. Ct.</u>, 45 Cal. 4th 963, 974 (2009).  When the plaintiff
succeeds in having the superior court set aside those findings,
only then may the plaintiff pursue other remedies such as a
damages action in court.  <u>Id.</u> at 976; <u>Johnson v. City of Loma</u>
<u>Linda</u>, 24 Cal. 4th 61, 76 (2000).

1  that a plaintiff must overturn a quasi-judicial action received

2  in an administrative proceeding by first pursuing a judicial

3  mandamus action before filing a tort claim).  The reasons

4  underlying this requirement, that the plaintiff must first

5  exhaust judicial remedies, are two-fold: (1) to accord proper

6  respect to an administrative agency's quasi-judicial procedures

7  by preventing a party from circumventing the established process

8  for judicial review; and (2) to provide a "uniform practice of

9  judicial, rather than jury, review of quasi-judicial

10  administrative decisions." Johnson, 24 Cal. 4th at 70 (quoting

11  Westlake, 17 Cal. 3d at 484.)  "Refusing to give binding effect

12  to the findings of administrative agencies in quasi-judicial

13  proceedings would ... undermine the efficacy of such proceedings,

14  rendering them in many cases little more than rehearsals for

15  litigation." Id. at 72.

16      However, "there are conditions or predicates to the

17  [judicial exhaustion] doctrine's application" Y.K.A. Industries,

18  Inc. v. Redevelopment Agency of City of San Jose, 174 Cal. App.

19  4th 339, 355 (2009).  For the doctrine to apply, both the

20  decision and the proceedings must be "of a sufficiently judicial

21  character to support collateral estoppel." McDonald v. Antelope

22  Valley Cmty. Coll. Dist., 45 Cal. 4th 88, 113 (2008); Y.K.A.

23  Industries, 174 Cal. App. 4th at 354 (explaining that the

24  doctrine of exhaustion of judicial remedies is "a form of res

25  judicata, of giving collateral estoppel effect to the

26  administrative agency's decision, because that decision has

27  achieved finality due to the aggrieved party's failure to pursue

28  the exclusive judicial remedy for reviewing administrative

43

action").

Collateral estoppel precludes relitigation of an issue when:
(1) the issue to be precluded is identical to the issue that was
decided in the former proceeding; (2) the issue was actually
litigated in the former proceeding; (3) the issue must have been
necessarily decided; (4) the prior decision must have been final
and on the merits; and (5) the party must be in privity with the
party in the former proceedings.  Y.K.A. Industries, 174 Cal.
App. 4th at 355-56.

Judicial exhaustion also does not apply if the statute
governing the administrative proceeding expressly authorizes a
parallel, independent remedy through an action for damages.  See
State Board of Chiropractic Examiners v. Super. Ct., 45 Cal. 4th
963, 975-76 (2009).  In State Board of Chiropractic Examiners,
the final administrative decision at issue was an adverse finding
by the State Personnel Board on the plaintiff's whistleblower
retaliation claim.  Id. at 969-70.  The plaintiff there later
sued for damages pursuant to California Government Code
§ 8547.8(c)[20] which, "in addition to all other penalties provided
by law, . . . [provides an] action for damages . . . [if] the
injured party has first filed a complaint with the State

---

[20]   California Government Code § 8547.8(c) states in part:
"In addition to all other penalties provided by law, any person
who intentionally engages in acts of reprisal, retaliation,
threats, coercion, or similar acts against a state employee or
applicant for state employment for having made a protected
disclosure shall be liable in an action for damages brought
against him or her by the injured party . . . .  However, any
action for damages shall not be available to the injured party
unless the injured party has first filed a complaint with the
State Personnel Board pursuant to subdivision (a), and the board
has issued, or failed to issue, findings pursuant to Section
19683."

1  Personnel Board ... and the board has issued, or failed to issue,
2  findings." Id. at 970.  The California Supreme Court held that
3  the State Personnel Board's finding did not have preclusive
4  effect because Section 8547.8(c) expressly authorized a parallel,
5  independent remedy through a damages action in superior court.
6  Id. at 976.  Section 8547.8(c) did not require that the adverse
7  findings be set aside through a writ of mandate action but
8  required only that a complaint be filed with the Board and that
9  the Board issue or fail to issue findings.  Id.  Accordingly, the
10 Court held the plaintiff could proceed with a damages action
11 after filing a complaint with the Board.   Id.

12      An administrative proceeding has characteristics essential
13 to giving administrative findings collateral estoppel effect when
14 it includes, but is not limited to, the following:  a hearing
15 before an impartial decision maker; testimony under oath; the
16 opportunity to subpoena, call, examine, and cross-examine
17 witnesses; the ability to introduce documentary evidence and to
18 make oral and written arguments; a formal record of the hearing;
19 and a written statement of reasons for the decision.  McDonald,
20 45 Cal. 4th at 113, Y.K.A. Industries, 174 Cal. App. 4th at 356.
21 In the absence of quasi-judicial proceedings with such
22 characteristics, a plaintiff need not seek judicial relief to set
23 aside any findings or bear the consequences of their binding
24 effect.  McDonald, 45 Cal. 4th at 113.

25      In this case, defendants argue that the doctrine of judicial
26 exhaustion applies to the administrative hearing process at issue
27 here because it was sufficiently judicial in nature. (Defs.' MSJ
28 at 46.)  Defendants further contend that, contrary to plaintiff's

argument, the *advisory* nature of the arbitrator's findings does not impact application of the doctrine.  To support their argument, defendants rely on Miller v. City of Los Angeles, 169 Cal. App. 4th 1373 (2008).  In Miller, the plaintiff city employee appealed to the Board of Civil Services Commissioners ("Board") when the City of Los Angeles discharged him.  Id. at 1376.  The Board appointed a hearing examiner, who conducted evidentiary hearings for two days and summarized the testimony and evidence in a 14-page report.  Id.  In the report, the hearing examiner recommended that the Board uphold the discharge. Id. at 1377.  After the Board informed the plaintiff of the report and before the Board met to consider the report, the plaintiff filed a "Notice of Withdrawal and/or Dismissal of Appeal from Discharge."  Id.  The Board later sustained the discharge.  Id.  Nine months after his discharge, the plaintiff filed a complaint alleging claims under FEHA.  Id. at 1378.

        The appellate court held that the plaintiff was obliged to exhaust his judicial remedies by having the hearing examiner's decision set aside through a mandate action in superior court. Id. at 1382.  The plaintiff's failure to do so, when he had already participated in "multiple hearings, cross-examined witnesses, presented evidence, and received the lengthy report and recommendation of the hearing examiner," made the administrative decision "final and on the merits and, consequently, entitled to collateral estoppel effect."  Id.  The court emphasized that once a plaintiff has initiated the administrative process and proceeded through evidentiary hearings to a proposed decision, a plaintiff is "not then free to ignore

46

1  and abandon the administrative process and proceed to [an action]

2  for damages." Id. at 1381 (quoting Page v. Los Angeles County

3  Probation Dept., 123 Cal. App. 4th 1135, 1142 (2004)).

4     Here, plaintiff emphasizes the "advisory" nature of the

5  arbitration proceedings in this case in an effort to distinguish

6  Miller. (Amended Opp'n at 32.) However, the court finds that

7  plaintiff's arbitration proceeding is comparable, if not more

8  quasi-judicial in nature than the proceedings in Miller, which

9  were also advisory. Here, the administrative proceedings lasted

10 seven days and plaintiff was represented by counsel. (Mem. &

11 Order, filed May 23, 2007, at 11.) As in Miller, plaintiff was

12 allowed to call witnesses and present documentary evidence. Id.

13 The arbitration was presided over by a qualified arbitrator,

14 selected by the parties, who applied the American Arbitration

15 Association Voluntary Arbitration Rules to the hearing. Id. In

16 Miller, the advisory nature of the arbitrator's recommendation

17 did not preclude the court from applying the doctrine of judicial

18 exhaustion. Miller, 169 Cal. App. 4th at 516 (finding that the

19 plaintiff was "obligated to exhaust his judicial remedies" when

20 the plaintiff had already participated in multiple hearings,

21 cross-examined witnesses, presented evidence and received the

22 lengthy report and recommendation of the hearing examiner).

23 Similarly, as plaintiff, in this case, has participated

24 extensively in hearings of a quasi-judicial nature, plaintiff is

25 obligated to exhaust his judicial remedies. Accordingly, because

26 plaintiff failed to follow the judicial review procedures to

27 completion when he dismissed his petition for a mandamus review

28 (Docket #24 at 7), the arbitrator's findings have achieved

finality and bar plaintiff from asserting his state law claims in
this action.

In opposing defendants' motion, plaintiff also relies on
this court's previous ruling, denying defendants' motion to
dismiss on res judicata grounds (Mem. & Order, filed May 23,
2007), as well as the definition of "judicial capacity" as stated
in <u>Miller v. County of Santa Cruz</u>, 39 F.3d 1030 (9th Cir. 1994).
However, in the court's prior ruling, it analyzed whether the
complaint, as a whole, was barred by the doctrine of res judicata
according to federal common law rules of preclusion.  (Docket #24
at 9-14.)   In <u>Miller v. County of Santa Cruz</u>, the issue presented
was narrowly confined to the preclusive effect of a state
administrative tribunal's findings in a Section 1983 action
brought in federal court.  <u>Miller</u>, 39 F.3d at 1032.  This court
relied on <u>Miller v. County of Santa Cruz</u> to analyze whether the
state arbitration proceedings met the "fairness requirements" of
federal common law; specifically, whether the arbitration
proceedings were of sufficient "judicial capacity" such that
under the federal rules of preclusion this action was barred.

The issue presented now is wholly different.  On the instant
motion, defendants argue that plaintiff's state law claims are
barred due to his failure to exhaust judicial remedies by
pursuing a writ of administrative mandate in superior court.
Although the issue implicates principles of collateral estoppel,
it is analyzed according to state law on judicial exhaustion.
Indeed, at the time of the court's decision on defendants' motion
to dismiss, the California court of appeal's decision in <u>Miller</u>
had not been issued.  Accordingly, for all of these reasons,

48

plaintiff's reliance on the Ninth Circuit's opinion in Miller v. County of Santa Cruz is unavailing.

Finally, the court notes that plaintiff, in the first amended complaint, cites to California Labor Code §§ 2699 et seq. to support his claim for statutory penalties and fines for a Section 1102.5 violation.  However, plaintiff does not argue in opposing the instant motion that Section 2699 authorizes a parallel, independent remedy similar to Government Code § 8547.8, which was at issue in State Board of Chiropractic Examiners. Nonetheless, even had plaintiff raised this argument, the court finds that the holding in State Board of Chiropractic Examiners is not applicable to this case.   In State Board of Chiropractic Examiners, the exemption from judicial exhaustion was premised on the specific language in Section 8547.8(c), which is not at issue here.   State Board of Chiropractic Examiners, 45 Cal. 4th at 976. In State Board of Chiropractic Examiners, the court emphasized that the statute expressly provided that the only precondition to an additional damages action was that a complaint be filed with the State Personnel Board and that the Board issue or fail to issue findings.   Id.   In contrast, the procedural requirement laid out in Labor Code § 2699 is less explicit.   Section 2699 simply states that a plaintiff "may, as an alternative," recover civil penalties through a civil action by following the procedures in Section 2699.3.   Cal. Lab. Code § 2699.[21]   Unlike

---

[21]   California Labor Code § 2699(a) states: "Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of
(continued...)

Government Code § 8547.8(c), the language does not *explicitly* grant plaintiff an additional remedy.  As the statute does not expressly authorize an additional remedy when a plaintiff has already initiated and is in the process of administrative proceedings, the court finds that plaintiff is not exempted from the judicial exhaustion requirement, as was the case in <u>State Board of Chiropractic Examiners</u>.

Accordingly, because it is undisputed that plaintiff did not exhaust his judicial remedies (Docket #24 at 7), his fifth and sixth claims for relief under state law are barred.  Defendants' motion for summary judgment is GRANTED as to these claims.

### CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part defendants' motion for summary judgment. Defendants' motion is GRANTED with respect to all of plaintiff's claims for relief, except plaintiff's equal protection claim asserted against each of the defendants.  On that claim, alone, triable issues of fact remain as to whether defendants discriminated against a distinct group of employees, of which plaintiff was a member, by treating plaintiff's group categorically different than other similarly situated employees, in imposing discipline and rendering decisions to terminate

---

[21](...continued)
its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3."

1  employees.

2       IT IS SO ORDERED.

3  DATED: December 11, 2009.

4

5              FRANK C. DAMRELL, JR.
            UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28